**T.B., Appellee,**

v.

**L.R.M., Appellant.**

Superior Court of Pennsylvania.

Argued Sept. 8, 1999.
Filed June 5, 2000.

Nicholas Banda, Johnstown, for appellant.

Walter A. Wisz, Ebensburg, for appellee.

Before McEWEN, President Judge, and DEL SOLE, KELLY, POPOVICH, JOHNSON, FORD ELLIOTT, EAKIN, JOYCE, and STEVENS, JJ.

KELLY, J.:

¶ 1 In this appeal, Appellant asks us to determine whether the trial court erred when it granted Appellee limited visitation of Appellant's child, A.M. Specifically, Appellant challenges the propriety of the trial court's determination that Appellee has standing to seek visitation, its denial of Appellant's untimely request for a hearing before a trial judge, and its decision that limited visitation with Appellee is in the child's best interest. We hold that under the facts and circumstances of this case,

the issue of standing was correctly decided. We further hold that the trial court properly denied Appellant's untimely request for a hearing before a trial judge. Finally, we hold, the record does not provide an adequate basis for review of the trial court's decision that limited visitation is in the child's best interest. Accordingly, we vacate the visitation order and remand for further proceedings in accordance with this opinion.

¶ 2 The relevant facts and procedural history of this appeal are as follows. Appellant and Appellee are openly acknowledged lesbians, who first met in the early 1980's. In the late 1980's they began an exclusive relationship, and eventually moved in together in 1990. Soon thereafter, the parties jointly purchased a home, and shared finances and expenses, paid through a joint bank account.

¶ 3 The parties also agreed to have a child. Following their decision in early 1992, Appellant researched the details of the desired pregnancy. The parties decided that Appellant would be impregnated. Appellant chose the person who would donate his sperm for the purpose of her artificial insemination. Together, the parties planned for Appellant's pregnancy.

¶ 4 Appellant became pregnant through artificial insemination at the end of 1992.[1] After Appellant became pregnant, Appellee helped to take care of Appellant and attended the Lamaze classes as Appellant's birthing coach. Appellee was the designated co-parent for purposes of being present in the operating room when Appellant underwent delivery by caesarian section. A.M. was born on August 27, 1993. The parties did not have any formal document representing a co-parenting agreement because Appellant had assured Appellee that none was needed. After A.M.'s birth, Appellant, Appellee and A.M. lived together in their home. Appellant also executed a will, which named Appellee as guardian of A.M.[2]

¶ 5 The facts as found by the hearing officer also show that the parties shared the rights and responsibilities of child rearing. Appellee participated in the day-to-day care of A.M. for the first three years of her life and was active, yet deferential to Appellant, in making parental decisions. During those years, Appellee provided for the child's care at home whenever Appellee was not working during the day. On days when Appellee worked a day shift, she was the one to take the child to daycare. If A.M. were sick, then Appellee took off from work to care for A.M. The parties also shared the responsibility for the child's medical checkups and other appointments. Appellee undertook exclusive responsibility for A.M. when Appellant was away from home.

¶ 6 Throughout the three years that the parties lived together after A.M. was born, Appellee acted as a co-parent. A.M. knew Appellee as "Aunt [T.]," referred to Appellee's sisters as "aunt," and received Christmas and birthday gifts from Appellee's family. In addition, Appellant, Appellee and A.M. together took camping or other day trips and family vacations together.

¶ 7 In May 1996, Appellant and Appellee sold their home and together purchased and moved into a new house, as an accommodation to changes in Appellant's employment. Shortly after they moved into their new home, Appellee left the home to have an affair. Although Appellee soon returned to the residence during the sum-

1. The record indicates that both parties knew the sperm donor, who agreed to donate his sperm for the insemination on the condition he would have no liability or responsibility whatsoever for the child. Shortly after the child's birth, he insisted on the legal termination of his parental rights, which were finally terminated in November 1993.

2. Appellant later changed her will to name Appellant's oldest sister and her husband as guardians of the child. Appellant changed her will a second time to name Appellant's brother and sister-in-law as guardians.

mer of 1996, the parties' relationship was severely strained. Appellant ultimately asked Appellee to move out of their home by August 1996, which is when the parties finally separated. After the separation, Appellee visited once with A.M., on September 4, 1996. After that time, Appellant refused all of Appellee's visitation requests, telephone calls, and gifts for the child.

¶ 8 On October 3, 1996, Appellee promptly filed a complaint for shared legal custody and partial physical custody for purposes of visitation.[3] Appellant's counsel accepted service of Appellee's complaint on December 6, 1996. Appellant filed preliminary objections to Appellee's complaint on December 9, 1996, asserting that Appellee lacked standing to pursue any claim with respect to the child.

¶ 9 The court scheduled a pre-hearing conference for January 30, 1997. The parties with counsel attended the conference. Following the conference, the hearing officer made certain recommendations to the court. On February 21, 1997, the court entered a consent order, wherein the parties **agreed** that the hearing officer, Theresa Homady, Esquire, would take testimony and make findings of fact and recommendations relative to Appellee's standing and her request for partial custody/visitation with the minor child. Thus, the parties agreed that the hearing would proceed before the designated hearing officer on Appellee's claim for partial custody/visitation. The parties also reserved their rights to file exceptions and submit the hearing officer's recommendations to the trial court for review. The parties also agreed that, following the hearing before the hearing officer, the trial court would rule on Appellant's preliminary objections on the standing issue and, if necessary, review and rule on the ultimate determination of partial custody/visitation. Neither party reserved any right to a *de novo* hearing before a trial judge.

¶ 10 The evidentiary hearing proceeded before the designated hearing officer on March 11, 1997. The parties presented six hours of testimonial evidence regarding their past and present lifestyles and their involvement with each other and with the child. Both parties presented testimony from other witnesses to support their respective positions regarding Appellee's standing and claim for visitation. Following the evidentiary hearing, the hearing officer found that Appellee had standing to seek custody/visitation by virtue of her *in loco parentis* status with respect to the child. The hearing officer also recommended that Appellee have partial custody for purposes of limited visitation. Finally, the hearing officer recommended that Appellant retain sole legal custody and primary physical custody of the child.

¶ 11 The hearing officer filed her final report on April 16, 1997. Appellant timely filed her exceptions to the hearing officer's report, to which Appellee filed a response. Appellee filed no exceptions. Following briefing, the parties argued Appellant's exceptions before the Honorable F. Joseph Leahey on June 16, 1997.

¶ 12 On June 20, 1997, Appellant made her first request for a hearing before a trial judge, pursuant to Pa.R.C.P.1915.4–1(b), on the issues of Appellee's standing and claim for partial custody/visitation. In her belated bid for a hearing, Appellant asserted that Rule 1915.4–1 compelled a hearing before a judge, where "standing" constitutes a complex issue of law and/or fact, which should be heard by an experienced trial judge, who is better equipped than the hearing officer to evaluate the live testimony of the witnesses. Appellant's motion additionally restated her exceptions to the hearing officer's report and recommendations, which had already been briefed and argued before the trial court. Principally, Appellant claimed, the record was insufficient to support the hearing officer's recommendation that visitation with Appellee was in A.M.'s best interest and a

**3.** Appellee did **not** request primary physical custody of A.M.

hearing was therefore necessary to supplement the record.

¶ 13 By opinion and order dated June 30, 1997, the trial court denied Appellant's request for a hearing before the judge, reasoning that Appellant had failed to request a hearing "promptly after the filing of the complaint." (Trial Court Opinion and Order, dated June 30, 1997; R.R. at 69a–71a). Appellant later filed supplemental exceptions to the hearing officer's report and Appellee responded.

¶ 14 On August 26, 1997, the trial court entered its order,[4] adopting the hearing officer's recommendations. The court granted Appellant sole legal and primary physical custody of A.M. The court granted Appellee partial custody only for limited visitation. The court slightly modified the hearing officer's visitation recommendation by postponing the beginning date for visitation, adding specific visitation time periods, and placing certain restrictions on visitation. In its supporting opinion, the trial court adopted the hearing officer's findings of fact. The court concluded that the hearing officer had properly relied on *J.A.L. v. E.P.H.*, 453 Pa.Super. 78, 682 A.2d 1314 (1996) regarding the issue of Appellee's standing.

¶ 15 Sometime in early September, the parties attempted to implement the trial court's limited visitation schedule. Meanwhile, Appellant timely filed an appeal on September 24, 1997. On the same day, Appellant filed a petition with the trial court for a stay pending appeal.

¶ 16 The hearing on Appellant's petition for supersedeas pending appeal proceeded on October 16, 1997. The hearing began with an opening statement by Appellant's counsel, which outlined for the court the four-step analysis of *Dincer v. Dincer*[5] pertinent to Appellant's petition. In presenting opening statements to the court, Appellant's counsel candidly admitted that it would be difficult to assess the likelihood of Appellant's success on appeal, particularly in light of the developing case law in this jurisdiction. Regarding the remaining *Dincer* elements, the court decided to take testimony from the parties.

¶ 17 Appellant testified that she and Appellee had attempted to carry out the visitation order and that the first visit on September 6, 1997, was emotionally charged. Appellant stated that after almost a year, the child did not immediately remember Appellee. Appellant further claimed that Appellee was emotionally upset and cried when she came to pick up A.M. for their first visit. Appellant stated that she had to wait until Appellee calmed herself before she would allow her access to the child.

¶ 18 Appellant further informed the court that Appellee had asked to reschedule the next Saturday visit for a mid-week visit due to a conflict with Appellee's school schedule. Appellant did not favor mid-week visits. After consultation with counsel, Appellant refused to adjust the visitation schedule. The September Saturday visits occurred as scheduled, with each visit lasting four hours.

¶ 19 In October, the visitation order increased the Saturday visits to nine hours each. Following the October 11, 1997 visit, Appellant complained, she learned that

4. The trial court's order provided Appellee with one visitation period per month, from 10:00 A.M. on Saturday until 7:00 P.M. on Sunday, all responsibility for transportation on Appellee. The Order further admonished both parties to refrain from any comment or behavior deemed by the court as potentially harmful to the child. Finally, the Order explicitly recognized that the visitation arrangement is subject to continued review. (*See* Trial Court Order, dated August 26, 1997; Appellant's Brief at 2–3.)

5. 446 Pa.Super. 1, 666 A.2d 281 (1995), *appeal granted in part*, 545 Pa. 171, 680 A.2d 873 (1996), *reversed on other grounds*, 549 Pa. 309, 701 A.2d 210 (1997). These elements include Appellant's likelihood of prevailing on the merits of the appeal, the likelihood of irreparable harm to Appellant and the child, the lack of substantial harm to Appellee, and the value of the stay to the public interest. *Id.* at 287.

Appellee had not followed Appellant's wishes regarding certain activities with the child. Specifically, Appellant was upset over Appellee's visit to a local campsite with the child, because smoke from a campfire might trigger an asthma attack for A.M. Appellant realized that the child had spent several hours at the campsite without her asthma medication. She also claimed that after the October 11th visit, the three-year old child had several "accidents" with respect to her otherwise perfect toilet training.[6]

¶ 20 On cross-examination, Appellant admitted that she had prohibited visits between Appellee and the child during the previous year because she was vigorously opposed to any contact, notwithstanding the court's order. Nevertheless, Appellant stated she would be willing to participate in counseling with Appellee to iron out the difficulties that she perceived were associated with the visitations.

¶ 21 Appellee gave testimony in which she admitted that she cried on the occasion of her first visit with the child. She also described as harmless the activities she engaged in with the child during the visitations. Appellee admitted that the child had soiled herself during the October 11th visit to the campsite. Appellee accepted full responsibility for the incident, stating that she had not properly kept track of the time for routine bathroom visits as Appellant had warned her to do. Appellee agreed to participate in counseling to facilitate the visits. She explained that she was tearful at the stay hearing because of the possibility that visitation would be taken from her, despite her extensive efforts and willingness to cooperate with Appellant. She also stated that she had no intention of enforcing any scheduled overnight visitation, due to start in November 1997, if the child did not want to stay overnight with Appellee.

¶ 22 By order dated October 22, 1997, the trial court denied Appellant's petition for supersedeas pending appeal. The court also encouraged the parties to cooperate with each other regarding either party's requests for minor modifications of the schedule.

¶ 23 On December 1, 1997, Appellant filed an application with this Court for a stay pending appeal. In her application with this Court, Appellant recast the events that occasioned the petition for stay and the testimony that occurred at the stay hearing in the trial court. In her petition with this Court, Appellant argued that she **was** likely to prevail on the merits of the case due to the developing law on the issue of third party standing to seek visitation over the objections of the child's mother. Further, she generally alleged (1) "irreparable harm" to her child if the visitations were allowed to continue during the appeal process, (2) no harm to Appellee if the visitations were stayed, and (3) preservation of the "*status quo,*" as defined solely by Appellant. This Court immediately granted Appellant's application for stay on December 5, 1997. As far as we know, Appellee has not seen A.M. since December 1997.

¶ 24 Meanwhile, the appeal in this case was scheduled for briefing, oral argument, and ultimately referred to a panel for disposition. The panel of judges assigned to the disposition of the appeal recommended the case for *en banc* review, which this Court later granted. The case was then scheduled for an *en banc* panel.

¶ 25 On appeal, Appellant raises the following issues for our review:

I. DID THE [TRIAL] COURT ERR IN CONCLUDING THAT A FORMER LESBIAN LOVER HAD STANDING TO SEEK SHARED LEGAL AND PARTIAL CUSTODY AND VISITATION OF A 3–YEAR OLD

**6.** The record reflects other significant changes in the child's life, including a change of primary residence. Appellant maintained that the child showed absolutely no regression until visitation with Appellee.

CHILD OVER THE OBJECTIONS OF THE CHILD'S NATURAL MOTHER?

II. DID THE [TRIAL] COURT ERR IN CONCLUDING THAT IT WOULD BE IN THE CHILD'S BEST INTEREST FOR A FORMER LESBIAN LOVER TO HAVE PARTIAL CUSTODY OF THE CHILD FOR PURPOSES OF VISITATION OVER THE OBJECTIONS OF THE CHILD'S NATURAL MOTHER?

III. DID THE [TRIAL] COURT ABUSE ITS DISCRETION BY FAILING TO HOLD A *DE NOVO* HEARING FOLLOWING A RECOMMENDATION BY A DOMESTIC RELATIONS HEARING OFFICER THAT A FORMER LESBIAN LOVER HAD STANDING TO SEEK SHARED LEGAL AND PARTIAL CUSTODY AND VISITATION OF A 3–YEAR OLD CHILD OVER THE OBJECTIONS OF THE CHILD'S NATURAL MOTHER?

IV. DID THE [TRIAL] COURT ABUSE ITS DISCRETION BY FAILING TO HOLD A *DE NOVO* HEARING FOLLOWING A RECOMMENDATION BY A DOMESTIC RELATIONS HEARING OFFICER THAT IT WOULD BE IN THE CHILD'S BEST INTEREST TO HAVE PARTIAL CUSTODY FOR PURPOSES OF VISITATION WITH HER MOTHER'S FORMER LESBIAN LOVER?

(Appellant's Brief at 4).

■ ¶ 26 Pennsylvania law provides the applicable scope and standard of review in child custody matters as follows:

[T]he appellate court is not bound by the deductions or inferences made by the trial court from its findings of fact, nor must the reviewing court accept a finding that has no competent evidence to support it. . . . Thus an appellate court is empowered to determine whether the trial court's incontrovertible factual findings support its factual conclusions, but it may not interfere with those conclusions unless they are unreasonable in view of the trial court's findings; and thus represent a[n]. . .abuse of discretion.

*Silfies v. Webster*, 713 A.2d 639, 642 (Pa.Super.1998) (quoting *Moore v. Moore*, 535 Pa. 18, 28, 634 A.2d 163, 168 (1993)). An abuse of discretion in the context of child custody does not consist merely of an error in judgment; it exists only when the trial court overrides or misapplies the law in reaching its conclusion or when its judgment is manifestly unreasonable or the result of partiality, prejudice, bias, or ill will, as shown by the evidence of record. *Zullo v. Zullo*, 531 Pa. 377, 613 A.2d 544 (1992). The ultimate test is "whether the trial court's conclusions are unreasonable as shown by the evidence of record." *Silfies, supra* at 642. The broad scope of review attendant to custody matters does not confer upon the reviewing court, the license or privilege of making independent factual determinations, nor does it authorize us to substitute our judgment for that of the trial court. *Charles v. Stehlik*, 560 Pa. 334, 744 A.2d 1255 (2000); *McMillen v. McMillen*, 529 Pa. 198, 602 A.2d 845 (1992); *Lombardo v. Lombardo*, 515 Pa. 139, 527 A.2d 525 (1987).

■ ¶ 27 Where, as here, the parties proceed by agreement before a hearing officer on the issues of standing and partial custody for purposes of visitation, the trial court is required to make an independent review of the record to determine whether the hearing officer's findings and recommendations are appropriate. *See generally* Pa.R.C.P.1915.4–1, 1915.4–2. Although advisory, the hearing officer's report and recommendations are given the fullest consideration particularly on the issue of credibility of witnesses, which the trial court is not empowered to second-guess. *See generally Neil v. Neil*, 731 A.2d 156 (Pa.Su-

per.1999) (holding that reviewing court may not second-guess hearing officer's credibility determinations).

■ ¶ 28 In her first issue, Appellant suggests that Appellee was required to present direct evidence or testimony that the child had established strong psychological bonds with Appellee such that Appellee had assumed in the child's eyes the stature of a parent. Absent this evidence, Appellant contends, Appellee did not adequately demonstrate her standing to bring a claim for custody/visitation. Appellant also charges that the hearing officer erred in this regard when she decided, "given the age of the child at the time of separation and her [current age], conclusive evidence of [psychological bonding] coming from the child is unlikely." (Hearing Summary, dated April 16, 1997, at 13; R.R. at 31a). Appellant claims that the hearing officer failed to determine if the child was capable of giving any evidence, conclusive or otherwise, about her feelings for Appellee. Appellant asserts that the hearing officer also failed to elicit any competent testimony from the witnesses who appeared at the hearing regarding Appellee's stature as a parent in the child's eyes or the child's psychological bond with Appellee. Appellant concludes that Appellee was improperly accorded standing to continue her action for custody/visitation. We disagree.

> The concept of standing, an element of justiciability, is a fundamental one in our jurisprudence: no matter will be adjudicated by our courts unless it is brought by a party aggrieved in that his or her rights have been invaded or infringed by the matter complained of. The purpose of this rule is to ensure that cases are presented to the court by one having a genuine, and not merely a theoretical, interest in the matter.
>
> * * *
>
> In the area of child custody, principles of standing have been applied with particular scrupulousness because they serve a dual purpose: not only to protect the interest of the court system by assuring that actions are litigated by appropriate parties, but also to prevent intrusion into the protected domain of the family by those who are merely strangers, however well-meaning. Thus in custody cases it has been held that an action may be brought only by a person having a *prima facie* right to custody.
>
> Biological parents have a *prima facie* right to custody, but biological parenthood is not the only source of such a right. Cognizable rights to seek full or partial custody may also arise under statutes such as Chapter 53 of the Domestic Relations Code, 23 Pa.C.S. §§ 5311 *et seq.* (permitting grandparents and great-grandparents to seek visitation or partial custody of their grandchildren or great-grandchildren), or by virtue of the parties' conduct, as in cases where a third party who has stood *in loco parentis* has been recognized as possessing a *prima facie* right sufficient to grant standing to litigate questions of custody of the child for whom he or she has cared.

*J.A.L. supra* at 1318–1319 (internal citations omitted).

> The phrase *"in loco parentis"* refers to a person who puts [herself] in the situation of assuming the obligation incident to a parental relationship without going through the formality of a legal adoption. The status of *in loco parentis* embodies two ideas: first, the assumption of a parental status, and second, the discharge of parental duties.

*Rosado v. Diaz*, 425 Pa.Super. 155, 624 A.2d 193, 196 (1993) (quoting *Commonwealth ex rel. Morgan v. Smith*, 429 Pa. 561, 565, 241 A.2d 531, 533 (1968)). "The rights and obligations arising out of the *in loco parentis* relationship are exactly the same as those arising between parent and child." *Karner v. McMahon*, 433 Pa.Super. 290, 640 A.2d 926, 929 (1994) (citing

*Gradwell v. Strausser*, 416 Pa.Super. 118, 610 A.2d 999 (1992)).

¶ 29 With regard to the appropriate evidentiary burden, this Court has further explained:

It is important to recognize that in this context, the term *"prima facie* right to custody" means only that the party has a colorable claim to custody of the child. The existence of such a colorable claim to custody grants standing only. In other words, it allows the party to maintain an action to seek vindication of...her claimed rights. A finding of a *prima facie* right sufficient to establish standing does not affect that party's evidentiary burden: in order to be granted full or partial custody, ...she must still establish that such would be in the best interest of the child under the standards applicable to third parties.

Thus the use of the term *"prima facie* right to custody" in a standing inquiry must be distinguished from the use of that term in the context of determining custody rights as between a parent and a non-parent. In this latter context, the natural parent's *prima facie* right to custody has the effect of increasing the evidentiary burden on the non-parent seeking custody. *See Campbell v. Campbell*, 448 Pa.Super. 640, 672 A.2d 835 (1996) (natural mother confused principles of standing with standard to be applied in deciding custody dispute); *Walkenstein v. Walkenstein*, 443 Pa.Super. 683, 663 A.2d 178 (1995) (same). Appropriate deference to the parent's right to custody thus does not require that all third parties be denied standing, or even that standing rules be applied in an overly stringent manner; the increased burden of proof required of third parties seeking custody rights provides an additional layer of protection for the parent. *See Kellogg v. Kellogg*, 435 Pa.Super. 581, 586–88, 646 A.2d 1246, 1249 (1994) (third parties who establish standing by virtue of *in loco parentis* are not elevated to status of

natural parent in determining merits of custody dispute); *Commonwealth ex rel. Patricia L.F. v. Malbert J.F.*, 278 Pa.Super. 343, 420 A.2d 572 (1980) (same).[2]

2  We note that in *Rowles v. Rowles*, 542 Pa. 443, 668 A.2d 126 (1995), the Pennsylvania Supreme Court reexamined the appropriate standard of proof in custody disputes between a parent and a non-parent. The Opinion Announcing the Judgment of the Court sought to abandon the presumption in favor of the parent in such cases, instead treating parenthood as a significant, although not paramount, factor in determining custody. *Id.* at 446–48, 668 A.2d at 128. That view, however, failed to command a majority of the court, and as a result, *Ellerbe* [*v. Hooks*, 490 Pa. 363, 416 A.2d 512 (1980)], which recognized the presumption, remains the law of this Commonwealth. *See Mollander v. Chiodo*, 450 Pa.Super. 247, [250–51] n. 1, 675 A.2d 753, 755 n. 1 (1996). Dictum by this Court in *Campbell, supra*, suggesting that *Rowles* changed the standard of proof in such cases is not binding upon this court or the trial courts. Moreover, even if the position espoused by the lead opinion in *Rowles* becomes law, the more flexible standard employed in that case would still grant some special protection to the parent in custody disputes with non-parents.

The *in loco parentis* basis for standing recognizes that the need to guard the family from intrusions by third parties and to protect the rights of the natural parent must be tempered by the paramount need to protect the child's best interest. Thus, while it is presumed that a child's best interest is served by maintaining the family's privacy and autonomy, that presumption must give way where the child has established strong psychological bonds with a person who, although not a biological parent, has lived with the child and provided care, nurture, and affection, assuming in the child's eye a stature like that of a parent. Where such a relationship is shown, our courts recognize that the child's best interest requires that the third party be granted standing so as to have the opportunity to litigate fully the issue of whether that relationship should be maintained even over a natural parent's objections.

Although the requirement of *in loco parentis* status for third parties seeking child custody rights is often stated as though it were a rigid rule, it is important to view the standard in light of the purpose of standing principles generally: to ensure that actions are brought only by those with a genuine, substantial interest. When so viewed, it is apparent that the showing necessary to establish *in loco parentis* status must in fact be flexible and dependent upon the particular facts of the case. Thus, while unrelated third parties are only rarely found to stand *in loco parentis*, step-parents, who by living in a family setting with the child of a spouse have developed a parent-like relationship with the child, have often been assumed without discussion to have standing to seek a continued relationship with the child upon the termination of the relationship between the step-parents.

In addition, we have suggested that where a petitioner who is not biologically related to the child but has established a parent-like relationship with the child seeks not to supplant the natural parent, but only to maintain his relationship with the child through reasonable visitation or partial custody, his burden to establish standing is easier to meet.

In today's society, where increased mobility, changes in social mores and increased individual freedom have created a wide spectrum of arrangements filling the role of the traditional nuclear family, flexibility in the application of standing principles is required in order to adapt those principles to the interests of each particular child. We do not suggest abandonment of the rule that a petitioner for custody who is not biologically related to the child in question must prove that a parent-like relationship has been forged through the parties' conduct. However, we hold that the fact that the petitioner lived with the child as a result of the participation and acquiescence of the natural parent must be an important factor in determining whether the petitioner has standing. Additionally, where only limited custody rights are sought, the limited nature of the intrusion into the biological family must be considered in deciding whether standing has been made out.

*J.A.L.*, *supra* at 1319–1321 (Pa.Super.1996) (most internal citations omitted).[7]

---

7. Case law from other jurisdictions demonstrates recognition that nontraditional configurations of the nuclear family have replaced traditional models in recent years, which favors equitable considerations such as the doctrine of *in loco parentis* when deciding third party standing to seek custody/visitation. *See E.N.O. v. L.M.M.*, 429 Mass. 824, 711 N.E.2d 886 (1999), *cert. denied*, — U.S. —, 120 S.Ct. 500, 145 L.Ed.2d 386 (1999) (holding trial court has equity jurisdiction to grant visitation between child and birth mother's same-sex former partner as child's "*de facto* parent"); *V.C. v. M.J.B.*, 319 N.J.Super. 103, 725 A.2d 13, (1999), *affirmed*, 163 N.J. 200, 748 A.2d 539 (2000) (recognizing standing on equitable considerations of same-sex former partner of biological mother to request visitation but disallowing claim for joint custody as precluded by statute); *Barnae v. Barnae*, 123 N.M. 583, 943 P.2d 1036 (App.1997), *cert. denied*, 123 N.M. 446, 942 P.2d 189 (1997) (holding New Mexico would retain jurisdiction in child custody dispute because same-sex former partner of biological mother would be denied standing under statute in alternative forum); *A.C. v. C. B.*, 113 N.M. 581, 829 P.2d 660 (App.1992), *cert. denied*, 113 N.M. 449, 827 P.2d 837 (1992) (confirming standing in custody dispute by virtue of custody and time-sharing agreement between natural parent and third party); *In re Custody of H.S.H.-K.*, 193 Wis.2d 649, 533 N.W.2d 419 (1995), *cert. denied*, 516 U.S. 975, 116 S.Ct. 475, 133 L.Ed.2d 404 (1995) (recognizing trial court's equitable power to hear same-sex former partner's petition for visitation when it determines that petitioner has parent-like relationship with child, even though petitioner could not assert claim to custody or statutory claim to visitation).

Other jurisdictions have denied standing to third parties seeking custody or visitation based upon a lack of statutory authority to entertain the claim. *See In re Guardianship of Z.C.W.*, 71 Cal.App.4th 524, 84 Cal.Rptr.2d 48 (1999); *West v. Superior Court*, 59 Cal. App.4th 302, 69 Cal.Rptr.2d 160 (1997); *Curiale v. Reagan*, 222 Cal.App.3d 1597, 272 Cal. Rptr. 520 (1990) (holding no statutory standing under Family Law Statutes for same-sex

¶ 30 The disputing parties in *J.A.L.* were also acknowledged lesbians who lived together in an exclusive intimate relationship for a number of years. Following several years of discussion, the parties agreed that the biological mother, E.P.H., would be artificially inseminated in an attempt to conceive a child whom the parties would raise together. Together, the parties selected a sperm donor and arranged for the donor to relinquish his parental rights. Following a number of inseminations by J.A.L. of the donor's sperm, E.P.H. became pregnant. J.A.L. accompanied E.P.H. to doctor visits, attended childbirth classes, and was present at the child's birth. In registering the child's birth, E.P.H. gave the baby J.A.L.'s surname as a middle name but later, she had the child's name legally changed. *Id.* at 1316–1317.

¶ 31 An attorney for the parties prepared a guardianship document, a medical treatment authorization, a will and a co-parenting agreement in anticipation of the child's birth. The parties executed all but the last of the documents, as counsel advised that the co-parenting agreement was not enforceable in Pennsylvania. Following the parties' separation, E.P.H. revoked the documents. *Id.* at 1317.

¶ 32 After the child's birth, the parties lived together with the child in their jointly owned home. E.P.H. was the primary caregiver, while J.A.L. assisted in all aspects of the baby's care, particularly during the first few weeks after the birth while E.P.H. recovered from a caesarian section. J.A.L. cared for the baby alone from time to time, and provided primary financial support during E.P.H.'s maternity leave. By the time the child was a year old, the parties had separated. For the next two years, E.P.H. allowed J.A.L. limited visitation. E.P.H. ultimately advised J.A.L. that she no longer wanted to have any contact with J.A.L. Accordingly, E.P.H. ended the visits. J.A.L. initiated an action for partial custody. The trial court dismissed the complaint for partial custody, holding that J.A.L. lacked standing. On appeal, this Court held that the evidence of record established J.A.L. had *in loco parentis* status with respect to the child and, therefore, standing to seek partial custody. Accordingly, the case was remanded to the trial court for a full custody hearing to determine whether partial custody was in the child's best interest.

¶ 33 Applying *J.A.L.* to the facts of the instant case, as agreed to by the parties, the hearing officer found as follows:

Analysis – Standing
* * *

Throughout the testimony, it was clear that [Appellee] considered her relationship with the [Appellant] as more than just good friends, and that she considered her relationship with the child as co-caregiver, even though she conceded major decisions to [Appellant] as the natural mother. [Appellant]'s testimony downplayed [Appellee]'s role, placing it more in the realm of just the person who lived with her. Credibility of the parties certainly comes into play in such a case.

Factors favoring [Appellee]'s version of the events include:

a. Her presence at the conception – her version of the events is more credible because the natural parents differed over an important fact, whether father

former partner to seek custody of or visitation with former partner's biological child; *de facto* parenthood doctrine has no basis independent of juvenile dependency concerns). *See also Music v. Rachford,* 654 So.2d 1234 (Fla. App.1995) (holding visitation rights with regard to non-parent are statutory and court has no inherent authority to award visitation); *Alison D. v. Virginia M.,* 77 N.Y.2d 651, 572 N.E.2d 27, 569 N.Y.S.2d 586 (1991) (denying standing to assert claims to visitation of same-sex former partner of biological parent absent statutory authority establishing such third-party right); *In re Thompson,* 11 S.W.3d 913 (Tenn.Ct.App.1999) (holding same); *Titchenal v. Dexter,* 166 Vt. 373, 693 A.2d 682 (1997) (declining to apply *de facto* parent status under adoption statute to same-sex former partner of adoptive parent).

was in the room when [Appellant] was inseminated. Considering [Appellant]'s aversion to having sex with father to conceive, it is likewise not [credible] that [Appellant] would have inseminated herself in front of father. Father and [Appellant] also differed in their testimony as to [other details of the insemination]. Furthermore, if [Appellee] and [Appellant] were lovers **and** best friends **prior** to the pregnancy, the likelihood of [Appellee] being involved, instead of sleeping through, this major event that would affect both of their lives, is great.

b. [Appellee]'s attendance at Lamaze classes and her presence in the delivery room.

c. [Appellee]'s moniker of "Aunt", when she could have just been known by her first name to the child indicates a desire to give the [Appellee] and the child a relationship greater than just friend of mother or roommate.

d. [Appellee] and [Appellant]'s vacations with the child and family members from both sides.

e. [Appellee] and [Appellant]'s purchase of **two** residences together, one prior to the birth of the child, and one after, to make it more convenient for [Appellant] to work and take the child to daycare, indicates a lasting relationship and commitment.

f. [Appellee]'s openness with her family about her relationship with the [Appellant], and her discussions with her family about having a child with [Appellant] prior to the child's conception and birth. On the other hand, [Appellant]'s mother testified that she didn't know [Appellee] and [Appellant] had had a sexual relationship. Likewise, [Appellant] only told a good friend who had gone on trips with [Appellee] and [Appellant] and child, that she was a lesbian and had had a relationship with [Appellee], a month before the hearing on the custody.

g. [Appellant]'s obvious efforts to distance herself from her relationship with [Appellee] and [Appellee]'s relationship with the child after the separation. Such things include the fact that [Appellant] has now told the child [the identity of] her father, in spite of [his] specific request that the child not know, and his obvious efforts to have no liability and responsibility for the child....

h. [Appellant]'s total denial that [Appellee] has any involvement whatsoever with the child. If, as [Appellant] insists, the relationship between [Appellee] and [Appellant] was just best friends, the very fact that they were best friends and living together since the birth of the child, and [Appellee] was known as "Aunt" to the child, must necessarily lead one to believe that [Appellee] had some role and responsibilities for the care and welfare of the child. Even accepting only the [Appellant]'s version of [Appellee]'s involvement, [Appellee] was surely more than just a lodger sharing a house.

**All the above inconsistencies in the testimony of [Appellee] and [Appellant] raise questions of credibility that must be resolved in favor of the [Appellee].** During the testimony, [Appellee] frequently had to wipe tears away when referring to her relationship with [A.M.], while [Appellant]'s demeanor revealed no emotion whatsoever, whether talking about her relationship with the [Appellee], or the child. Also, **[Appellee]'s testimony struck this hearing officer as less rehearsed and calculated to meet or not meet the factual circumstances laid out in** *J.A.L. v. E.P.H., supra.* [Emphasis added.]

As the Superior Court noted in that case, cognizable rights to seek full or partial custody may arise by virtue of the parties' conduct. It seems as if the [Appellant] took each nexus cited by the Superior Court in said case to create a bond between the non-parent and the child, and specifically testified against said nexus. On the other hand, [Appellee], while testifying about some of the

things listed by the Court, also testified to other things that would appear to lessen her tie, such as the choice of doctor. [Appellant] emphatically never gave a concession to the status of the relationship between [Appellee] and the child, or her intention as to their relationship. Everyday experience would lead one to the conclusion that, given the length of time the parties were together and their alleged relationship, there must have been at least some nexus between [Appellee] and the child, not the total void [Appellant] would have us believe.

(Hearing Summary, dated April 16, 1997, at 8–12; R.R. at 26a–30a) (emphasis added). Following careful review of the applicable law, Judge Leahey's opinion discussed and disposed of Appellant's standing issue as follows:

In her exceptions, [Appellant] first argues that the Hearing Officer erred in not recommending that [Appellee's] complaint be dismissed for lack of standing. In support of her argument, [Appellant] avers that the Hearing Officer's findings of fact are in error because she misinterpreted the evidence and, in an arbitrary and capricious manner, ignored [Appellant's] testimony and credited that of [Appellee]. We cannot agree. We have thoroughly reviewed the entire record in this matter, including the transcript of the hearings held by the Hearing Officer, and find her report to be exemplary; it is well-reasoned and thoughtfully prepared. We adopt the Hearing Officer's findings of fact which are amply supported by the record. We stress that the Hearing Officer was not required to accept [Appellant's] testimony; she was free to accept all of [Appellant's] testimony or none of her testimony. *See Aletto v. Aletto*, 371 Pa.Super. 230, 537 A.2d 1383 (1988). We will not disturb the Hearing Officer's credibility determinations. We further add that the Hearing Officer, relying on the recent decision of *J.A.L.* [*supra*], which held that a lesbian lover

may have standing to seek partial custody of a minor child, properly found that [Appellee] stood *in loco parentis* to the child and thus has standing.

(Trial Court Opinion, dated August 26, 1997, at 2–3).

¶ 34 The facts and circumstances of this case make clear that Appellant and Appellee lived together in an exclusive intimate relationship for a number of years before A.M. was conceived and born. The parties jointly purchased two homes, and shared finances and expenses, paid through a joint bank account.

¶ 35 Because Appellant wanted to become pregnant, she researched the details of the desired pregnancy. The testimony reflects that Appellant did not attempt actual insemination until she was economically situated to support the child. The credible testimony accepted by the hearing officer was that both parties planned for the pregnancy and participated in the insemination.

¶ 36 After Appellant became pregnant, Appellee assisted Appellant, attended the Lamaze classes as Appellant's birthing coach, and was the designated co-parent for purposes of being present in the operating room. Although the parties did not have any formal document representing a co-parenting agreement, Appellee testified Appellant had assured her that none was needed. After A.M.'s birth, Appellant, Appellee and A.M. lived together in their home for close to three years. Appellant also executed a will, which named Appellee as guardian of A.M.

■ ¶ 37 The facts as found by the hearing officer also show that the parties shared the responsibilities of raising A.M. Appellee participated in the day-to-day care of A.M. for the first three years of her life and was active, yet deferential to Appellant, in making parental decisions. During those years Appellee provided for the child's care at home whenever she was not working. When Appellee worked a

day shift, she took the child to daycare. Appellee took off from work to care for A.M. when the child was sick. The parties also shared responsibility for the child's medical checkups and other appointments. Appellee undertook exclusive responsibility for A.M.'s care when Appellant was away from home. Shortly before the child's third birthday, Appellant and Appellee together purchased their second home, as an accommodation to changes in Appellant's employment. In light of the relationship of the parties prior to A.M.'s birth and the evidence presented regarding the three years the parties lived together after A.M. was born, we conclude that Appellee assumed and discharged obligations and duties incidental to a parental relationship with the child. *See Rosado, supra.* The fact that Appellant was the child's primary caregiver or that her mother also helped Appellant at home following the delivery does not discount Appellee's clear and steady role in the child's life for the first three years. *See J.A.L., supra.* Appellee presented sufficient evidence to show that the opportunity for bonding between Appellee and the child occurred through Appellee's daily presence and consistent involvement in A.M.'s life. *Id.*

¶ 38 Moreover, we do not agree that Appellee failed to provide any testimony of attachment between A.M. and Appellee. To the contrary, Appellee's mother and sisters, as extended family, bore witness to Appellee's relationship with A.M. They testified to Appellee's involvement, care, affection for and sustained interest in A.M. The evidence that on many occasions, Appellant left the child in Appellee's care without concern also demonstrated Appellant's confidence that her child was safe with Appellee. The evidence that A.M. remained alone with Appellee for extended periods of time without complaint or resistance likewise demonstrated the child's trust in both parties. The credible evidence presented at the hearing supports the conclusion that Appellee assumed a parent-like role in A.M.'s life. We therefore reject Appellant's claim that Appellee offered no evidence that she had assumed in the child's eye the stature of a parental figure. Accordingly, we hold, Appellee was properly accorded standing to seek partial custody of A.M. for visitation purposes.[8]

¶ 39 Next, Appellant argues that the record lacks adequate discussion or consideration by the court of how an award of partial or temporary custody might affect the physical, intellectual, moral or spiritual well being of A.M. Appellant asserts that the hearing officer failed to inquire at the hearing regarding these factors, and, instead, focused her attention on resolving the issue of standing. Therefore, Appellant claims, Appellee's evidence at the hearing does not meet her burden to show that granting visitation over Appellant's objection serves the child's best interest. Appellant asserts that this claim was raised in her exceptions to the hearing officer's recommendations and in her request for a hearing before the judge. Appellant concludes that trial court erred in its decision to grant Appellee partial custody of the child for purposes of visitation, without the additional information a hearing would have provided. We agree.

¶ 40 The "best interest of the child" standard considers all factors that legitimately have an influence upon the child's physical, intellectual, moral and spiritual well being on a case-by-case basis. *Lee v. Fontine,* 406 Pa.Super. 487, 594 A.2d 724 (1991).

---

**8.** Appellant relies on *Ken R. on Behalf of C.R. v. Arthur Z.,* 546 Pa. 49, 682 A.2d 1267 (1996) for the proposition that Appellee does not meet the statutory requirements for standing under Pennsylvania law. In *Ken R.,* our Supreme Court held that a child did not have standing to seek court-ordered visitation with a minor sibling inasmuch as her interests were not protected under the statute granting standing to seek visitation. 23 Pa.C.S.A. § 5301. Here, Appellee asserted standing as *in loco parentis,* not by virtue of the statute. Therefore, *Ken R.* is inapposite, as it did not involve an assertion of *in loco parentis* status.

It is axiomatic that in custody disputes, "the fundamental issue is the best interest of the child." *Ellerbe* [*supra* ]. In a custody contest between two biological parents, "the burden of proof is shared equally by the contestants. . . ." *Id.* Yet, where the custody dispute is between a biological parent and a third party, the burden of proof is not evenly balanced. In such instances, "the parents have a *'prima facie* right to custody,' which will be forfeited only if 'convincing reasons' appear that the child's best interest will be served by an award to the third party. Thus, even before the proceedings start, the evidentiary scale is tipped, and tipped hard, to the [biological] parents' side." *Id.* at 514 (quoting *In re Hernandez*, 249 Pa.Super. 274, 376 A.2d 648, 654 (1977)).

*Charles, supra* at 340, 744 A.2d at 1258. The *prima facie* right to custody of the biological parent, our Supreme Court has explained, requires the third party to bear a heavy burden of production and persuasion. *Albright v. Commonwealth ex rel. Fetters*, 491 Pa. 320, 421 A.2d 157 (1980). Once evidence relevant to the child's best interest is presented, the court must decide whether the evidence on behalf of the third party is weighty enough to bring the scale up to even and then down on the side of the third party. *Karner, supra.*

¶ 41 The real question involves the quantity and quality of evidence required, to meet the "best interest" test. *Albright, supra.* The burden on a third party in a visitation case is not as heavy as it is in a custody case, because an order granting visitation is a lesser intrusion on the parent's right to continuous custody. *Bucci v. Bucci*, 351 Pa.Super. 457, 506 A.2d 438 (1986).

In a visitation case, the third party need only convince the court that it is in the child's best interest to have some time with the third party. As the amount of time requested moves the visit further from a visit and closer to custody, the reasons offered in support of the request must become correspondingly more convincing.

*Commonwealth ex rel. Williams v. Miller*, 254 Pa.Super. 227, 385 A.2d 992, 994 (1978). The distinguishing factors between simple visitation and partial custody include the length, frequency, place of visits, who has effective control of the child during the visits, and whether the custodial parent has the option of accompanying the child on the visits. *Bucci, supra* (distinguishing visitation and partial custody orders in context of order granting grandparents four annual two-hour visits away from custodial parent's home; order deemed visitation rather than custody order).

¶ 42 Pennsylvania law makes clear that a "best interest" analysis in any custody dispute should include a number of important factors, such as parenthood; the length of time the child has been separated from the party seeking custody; the adverse effect on the child caused by disruption of an established relationship; and the fitness of the party seeking custody. *In Re Donna W.*, 325 Pa.Super. 39, 472 A.2d 635 (1984) (dissenting opinion by Wieand, J.) (enumerating several factors of importance in deciding best interest of child). The majority disposition in *Donna W.* specifically rejected psychological bonding as determinative of a child's best interest in a custody dispute. *Id.* at 645. The Court explained that, because "the concept of a child's best interests is a legal concept, not to be defined [solely] in psychiatric terms, the question of bonding should not be the only one or the deciding factor." *Id.* See also *Burke v. Pope*, 366 Pa.Super. 488, 531 A.2d 782 (1987) (holding undue weight placed on psychological bonding not dispositive of best interest analysis and insufficient to transfer custody to third party).

¶ 43 Likewise, parenthood alone is not sufficient to defeat a third-party custody claim. *Dorsey v. Freeman*, 438 Pa.Super. 236, 652 A.2d 352 (1994). See *Spells v. Spells*, 250 Pa.Super. 168, 378 A.2d 879 (1977) (holding stepfather could

not be denied visitation with children of former spouse based solely on his status as non-biological parent). Moreover, the personal preference or prejudice of the biological parent in and of itself cannot control the court's decision. *Id. See also Williams, supra* (reiterating custodial parent's suspicion or animosity toward other parent or third party seeking visitation should not alone warrant denial of visitation).

¶ 44 Thus, we emphasize, a full inquiry is essential to determine what serves a child's best interest; all pertinent facts surrounding the contesting parties must be fully explored and developed. *Karner, supra* at 929. The paramount focus is the best interest of the child involved, not the respective rights of the contesting parties. *Albright, supra.* Factors having a significant effect on the child's well being can justify a custody finding in favor of a third party, even if the evidence does not show that the biological parent is unfit. *Mollander, supra* (quoting *Albright, supra* at 329, 421 A.2d at 161).

¶ 45 Finally, in all custody matters, effective appellate review requires a complete record. *E.A.L. v. L.J.W.*, 443 Pa.Super. 573, 662 A.2d 1109 (1995); *Barron v. Barron*, 406 Pa.Super. 401, 594 A.2d 682 (1991). Effective appellate review also necessitates "a comprehensive opinion containing an exhaustive analysis of the record and specific reasons for the court's ultimate decision." *Alfred v. Braxton*, 442 Pa.Super. 381, 659 A.2d 1040 (1995).

¶ 46 In the instant case, the trial court provided us with the following analysis:

[Appellant] next argues that the Hearing Officer erred in determining that it would be in the child's best interests to allow [Appellee] to have visitation with the child. She stresses that the decision is especially egregious in light of the fact that she, as the child's natural mother, objects to the visitation. Again, we cannot agree. As clearly recognized by the Hearing Officer, the paramount concern in child custody cases must be the best interest of the child. *In re Donna H.*, 412 Pa.Super. 205, 602 A.2d 1382 (1992). The "best interests" standard, which is decided on a case-by-case basis, considers all factors which legitimately have an effect upon the child's physical, intellectual, moral and spiritual well-being. *Lee* [*supra*]. As evidenced in the record, [Appellee] lived in the same household as [A.M.] for nearly three years. During this time, [Appellee] helped to physically care for the child on a day-to-day basis and undertook exclusive responsibility for the child's care when [Appellant] was at work or on vacation. A bond has been created between [Appellee] and the child; destruction of that bond would certainly not be in the best interests of the child. Further, we stress that the visitation awarded to [Appellee] is limited in nature. With the support of all parties involved, the child's best interests will be served by allowing the relationship between [Appellee] and the child to continue. Termination of the relationship between [Appellee] and [Appellant] is insufficient reason to end the [Appellee]/child relationship.

(Trial Court Opinion, dated August 26, 1997, at 2–3). According to the court's analysis, the sole contention was Appellant's personal dissatisfaction with the hearing officer's visitation recommendation, against Appellant's wishes. We agree with the trial court that Appellant's personal preference or prejudice alone does not control the ultimate decision regarding Appellee's prayer for visitation. *See Spells, supra.*

¶ 47 We have also looked at the hearing officer's discussion regarding A.M.'s best interest:

Analysis–Partial Custody/Visitation

As the Court indicated in *J.A.L.* [*supra*], a finding of standing in this case

does not change [Appellee]'s status as a third party seeking partial custody.

* * *

Therefore a determination must still be made as to whether it is in [A.M.]'s best interest to have a relationship with the [Appellee] that would consist of partial custody/visitation rights.

In the present case, [Appellee] lived with the child for almost the first three years of [the child's] life, and was accorded "Aunt" status, at the least. [Appellee] helped care for the child, played with the child, took [the child] to medical checkups and took [the child] to day care. [Appellee] went on vacation with the child and her mother and kept the child while mother was away. [Appellee] nurtured the child.

Nothing in the record indicates that [Appellee] cannot care for the child properly, with the most derogatory complaint being that [Appellee] sometimes got the child too excited or was too rough with [the child]. Undoubtedly, the child, during the first almost three years of . . . life, established a bond with [Appellee], and [Appellee] likewise established a bond with the child, or this action would not be before the court today.

Given [Appellee]'s status in the household, partial custody for purposes of visitation seems appropriate. Considering the length of time that has passed since [Appellee] has had any contact with [the child], it is believed a break-in period would be appropriate. Accordingly, I would suggest a gradual period of adjustment with increasing time spent with the child until overnight visitation for one weekend a month is accomplished.

(Hearing Summary, at 14–15; R.R. at 32a–33a).

¶ 48 Neither the hearing officer nor the trial court has given us specific reasons for their recommendation/decision that partial custody is in A.M.'s best interest, other than the evidence of bonding between Appellee and A.M. Granted, the bonding that occurred between Appellee and A.M. is indeed a significant factor in the analysis, but it is not dispositive. *See Burke, supra.* Notably absent from the hearing officer's or the trial court's analyses is any critical discussion of Appellee's child-care skills, her ability to understand and meet the needs of the child, her new home environment, or her conduct and interests from which the child may or may not benefit through continued contact. *See Karner, supra.* Indeed, a good deal of our time has been devoted to examining the record with great care for evidence in this regard.[9] We conclude, therefore, that the trial court erred in relying too heavily on the psychological bonding, to the exclusion of other factors relevant to a "best interest" analysis. While the psychological bond may have been sufficient to accord Appellee standing, *see J.A.L., supra,* absent more, it is not necessarily sufficient to meet Appellee's evidentiary burden relevant to the child's best interest in this custody/visitation dispute. *See Charles, supra; Albright, supra; Karner, supra* (requiring from third party evidence weighty enough to bring the scale up to even as between parent and third party and then down on side of third party). Although the court may have hoped for an amicable resolution between the parties, we must conclude that its judgment on the child's best interest is oversimplified.[10]

¶ 49 Consequently, we remand this case for an in-depth inquiry into the best interest of the child involved, as the present record does not provide an adequate basis

9. The briefs of the parties and *amicus curiae* lack a fully developed discussion of this issue as well and are of little assistance to us in the resolution of the matter.

10. We respect both the hearing officer and the judge, who declined to allow Appellant's veiled use of institutionalized homophobia as a weapon against Appellee, particularly in light of Appellant's admitted sexual and social preferences.

for comprehensive analysis or review. *See E.A.L., supra*; *Alfred, supra*; *Barron, supra*. Upon remand, both parties shall be given the opportunity to testify and present witnesses relevant to the best interest of A.M., because significant time has passed since Appellee's last contact with A.M. *See Artzt v. Artzt*, 383 Pa.Super. 23, 556 A.2d 409 (1989), *appeal denied*, 528 Pa. 275, 597 A.2d 1115 (1991) (stating that passage of significant amount of time since entry of custody order necessitates remand for full hearing to reconsider merit of prior order). The trial court must then re-evaluate its order in view of specific findings. Depending on its conclusions, the court may either alter or confirm the present custody order.[11] Nothing we say today may be construed to limit the ability of either party or the trial court to request or require additional proceedings.

▪ ¶ 50 In her third and fourth issues, Appellant argues that the trial court abused its discretion when it denied Appellant's request for a *de novo* hearing on the issues of standing and partial custody/visitation, even if she had waited to make that request until after the hearing officer had filed her report and recommendations, and the trial court had heard argument on Appellant's exceptions. Appellant contends that she was entitled to a *de novo* hearing before a trial judge in this case. Appellant maintains that the hearing officer's conclusions and recommendations were erroneous or insufficiently developed. We agree with the trial court that under the applicable rules, Appellant's request for a hearing before a judge was untimely. Nevertheless, we must also agree with Appellant that the court should have granted a hearing on the "best interest" issue, once the court was alerted to the underdevel-

oped nature of the evidence regarding that issue.

▪ ¶ 51 In reviewing a trial court's denial of a request for a *de novo* hearing, the reviewing Court employs an abuse of discretion standard. *Van Dine v. Gyuriska*, 552 Pa. 122, 713 A.2d 1104 (1998). Before 1995, Rule 1920.51(a)(2)(iii) prohibited the appointment of a master in a claim for legal, physical or shared custody. *Id.* Similarly, 23 Pa.C.S.A. § 3321 prohibited the appointment of a master to hear testimony on any custody issue. *Id.*

¶ 52 In 1995, the Rules of Civil Procedure suspended 23 Pa.C.S.A. § 3321 as it relates to partial custody matters. *See* Pa.R.C.P.1920.91(3) (effective January 1, 1995). Since 1995, a hearing officer is authorized to hear an action for partial custody or visitation. Pa.R.C.P.1915.4–1(a). As an alternative to a hearing before a hearing officer, a party in a partial custody and visitation case may, "**promptly** after the filing of the complaint," file a motion for a hearing before a judge where (1) there are complex questions of law and/or fact, or (2) the hearing will take longer than an hour, or (3) the parties certify to the court that there are serious allegations affecting the child's welfare. *See* Pa. R.C.P.1915.4–1(b)(1)–(3). If a request for a hearing before a trial judge is not made promptly after the complaint has been filed, or if the parties agree, the action can proceed before a hearing officer as set forth in Rule 1915.4–2. *See* Pa.R.C.P. 1915.4–1(a); 1915.4–2. This alternative procedure under Rule 1915.4–2 provides for an office conference, a hearing before a hearing officer, the opportunity to file exceptions and to brief and argue the exceptions before the trial court. *See* Pa.R.C.P. 1915.4–2.

*McMillen v. McMillen*, 529 Pa. 198, 602 A.2d 845 (1992) (holding that custody order is modifiable at any time if petitioner demonstrates that modification is in the best interest of the child); *G.B. v. M.M.B.*, 448 Pa.Super. 133, 670 A.2d 714 (1996) (*en banc*) (stating that custody orders are temporary in nature and always subject to change).

---

11. We are well aware that the order in question is quite limited, and circumscribed to protect the child's welfare, honor Appellant's wishes, and at the same time, grant Appellee some contact with A.M.. Moreover, as a result of the trial court's continued supervision in custody matters, including this one, custody orders can be subject to modification. *See*

¶ 53 Appellant, however, relies on *Ashford v. Ashford*, 395 Pa.Super. 125, 576 A.2d 1076 (1990) in support of her argument that she is **entitled** to a *de novo* hearing, if she is unwilling to accept the result of the proceeding before the hearing officer. Even though Appellant agreed to a hearing with the hearing officer, the hearing officer conducted an evidentiary hearing, submitted findings and recommendations to the court, Appellant filed exceptions, and argued them before court in accordance within the alternative procedure of Rule 1915.4–2, she still claims this entitlement.

¶ 54 *Ashford*, however, is factually and legally distinguishable from the case presently before this Court. *Ashford* involved an appeal to the trial judge for a hearing *de novo* on the issue of primary physical custody. *Id.* Here, only the standing issue and Appellee's claim for partial custody/visitation were submitted to the hearing officer for review and recommendation.[12] *See also Van Dine, supra* (stating that *Ashford* is still good law with respect to primary physical custody claims; holding that party seeking primary physical custody is entitled to *de novo* hearing; also implying by analogy that claims for legal custody cannot be addressed by hearing officer for same reasons).

■ ¶ 55 In addition, this Court decided *Ashford* in 1990, prior to the promulgation of Rules 1915.4–1, 1915.4–2, and the 1995 partial suspension of 23 Pa.C.S.A. § 3321. As our Supreme Court recognized in *Van Dine, supra*, the modification of the rules and the partial suspension of 23 Pa.C.S.A. § 3321 changed *Ashford*'s holding insofar as it prohibits the appointment of a hearing officer to decide partial custody or visitation matters. *Id.* at 1105. Although parties seeking primary custody or support are still entitled to a *de novo* hearing if one of the parties is unwilling to accept a master's or hearing officer's recommendations,[13] since 1995, this entitlement no longer automatically applies to parties in partial custody/visitation disputes. *Id.* Therefore, Appellant's reliance on *Ashford* is misplaced.

¶ 56 In the instant case, Appellee filed her complaint for partial custody/ visitation on October 3, 1996. Under Rule 1915.4–1(b), Appellant should have made a prompt request for a hearing before a judge following service of Appellee's complaint. Absent any request for a Rule 1915.4–1(b) hearing, an office conference was scheduled and conducted. At the pretrial conference, the parties **agreed** to proceed before a hearing officer, and also **agreed** to allow the hearing officer decide the substantive issues of standing and partial custody for purposes of visitation. The trial court entered a consent order to that effect on February 21, 1997. (*See* Consent Order, dated February 21, 1997; R.R. at 17a–18a.)

¶ 57 Later, in response to the hearing officer's report and recommendations, Appellant timely filed exceptions, contesting Appellee's standing and the recommendation of limited visitation. The trial court held argument on the exceptions. Following the hearing on the exceptions, the trial court adopted the hearing officer's findings of fact and credibility determinations, and concluded that the hearing officer's report was well reasoned and thoughtfully prepared. The trial court then dismissed Appellant's exceptions.

---

**12.** We recognize that Appellee's complaint also requested joint legal custody. That issue, however, was **not** submitted to the hearing officer as part of the parties' agreement. Nevertheless, the hearing officer recommended that Appellant retain sole legal custody of A.M. In making this recommendation, the hearing officer actually exceeded her authority. Neither party, however, challenged this recommendation in any respect. Thus, legal custody is no longer an issue in this case. Accordingly, it cannot form a belated premise to compel an untimely requested *de novo* hearing under *Van Dine, supra*.

**13.** Primary custody and support proceedings remain subject to the procedural requirements set forth in 23 Pa.C.S.A. § 3321, Pa. R.C.P.1915.1 *et seq.*, and Pa.R.C.P.1920.51. *Van Dine, supra*.

¶ 58 With respect to Appellant's request for a *de novo* hearing before a judge, the court stated that under the applicable rules, Appellant should have made her request promptly after the complaint was filed. Instead, Appellant waited until after the hearing officer conducted a hearing and the trial court heard argument on her exceptions. *See* Pa.R.C.P. 1915.4–1(b). Although the rule does not define "promptly," Appellant's failure to request a hearing before a judge until after (1) she had agreed to a hearing conducted by a hearing officer and to allow the hearing officer to determine substantive issues; (2) the trial court had entered a consent order to that effect on February 21, 1997; (3) she had filed exceptions contesting the hearing officer's findings; and, (4) the trial court had held a hearing on the exceptions, led the trial court to its decision that Appellant's request was untimely. We agree that Appellant's request for a hearing before a judge under Pa. R.C.P.1915.4–1(b) was untimely, and that Appellant was not *per se* **entitled** to a hearing upon request. *See Van Dine, supra.*

¶ 59 Due to our disposition of Appellant's second issue, however, we conclude that the trial court should have allowed a hearing to develop the record on the "best interest" issue. The court was put on notice by Appellant's exceptions that the "best interest" analysis of the hearing officer was lacking. Although not a question of entitlement *per se* under the applicable rules, the court should have realized that the record needed to be developed. For the reasons set forth in our disposition of Appellant's second issue, we will give the parties an opportunity to amplify their positions on the best interest of A.M.

¶ 60 Based upon the foregoing reasoning, we hold that under the facts and circumstances of this case, the issue of standing was correctly decided. We further hold that the trial court properly denied Appellant's untimely request for a hearing before a trial judge. Finally, we hold the record does not provide an adequate basis for review of the trial court's decision that visitation is in the child's best interest. Accordingly, we vacate the visitation order and remand the matter to the trial court for a more thorough look at the "best interest" issue in accordance with this opinion.

¶ 61 Order vacated; case remanded for further proceedings. Jurisdiction is relinquished.

DEL SOLE, J., concurring and dissenting:

¶ 1 I join my colleagues in the majority in all respects save one. I conclude that the trial court had a sufficient basis to determine that limited visitation was in the child's best interest. However, I acknowledge that the passage of time occasioned in this case may require a new hearing on this issue.

¶ 2 I would vacate the stay and permit implementation of the trial court's visitation order without prejudice to either party to seek changes based on the child's best interest.