# Petrole v. Petrole

*Thomas Carlyon,* for plaintiff.
*Cynthia A. Dyrda-Hatton,* for defendant.

NANOVIC, *J.,* March 20, 2003—Nicholas J. Petrole Sr. (Father) has appealed our dismissal of his exceptions to the hearing officer's custody report. The hearing officer recommended extending Maureen S. Petrole's (Mother) periods of partial physical custody to include overnight visits during the weeks Father works the swing shift, from 3:30 p.m. until midnight (12 a.m.).

## FACTS

On October 14, 1998, Father filed a complaint in divorce against Mother containing a claim for custody of the parties' minor children. The custody count was severed from the divorce proceedings. A decree of divorce was entered on August 8, 2001.

Mother and Father are the natural parents of five minor children: Nicholas J. Petrole Jr. (D.O.B. 11/12/87), Jonathan Petrole (D.O.B. 01/18/89), Albert Petrole, (D.O.B. 05/02/92), Michael Petrole (D.O.B. 05/31/94), and Anthony Petrole (D.O.B. 01/10/98). A custody order, docketed to no. 99-0451, was entered on October 20, 1999, granting Father primary physical custody and Mother partial physical custody on alternate weekends, holidays and special occasions.

On January 14, 2000, Mother filed a petition to modify the custody order. A hearing was held before the hearing officer, following which a custody order, docketed to no. 00-0096, was entered on May 5, 2000. This order, in combination with the October 20, 1999 order, granted Mother additional periods of physical custody during the week on an alternating weekly basis corresponding with the Father's rotating weekly work schedule as follows:

"(1) During the first week when Father works the swing shift (*i.e.,* 3:30 p.m. until midnight), Mother was granted partial physical custody on Monday and Friday from 3 p.m. until 8 p.m., and from Tuesday at 3 p.m. until Thursday morning with Mother responsible for arranging the school-age children's attendance at school and return of the younger children to Father's residence; and

"(2) During the following week when Father works the day shift (*i.e.,* 7 a.m. until 3:30 p.m.), Mother was granted partial physical custody from Tuesday at 3 p.m. until Wednesday morning with Mother responsible for arranging the school-age children's attendance at school and return of the younger children to Father's residence, Wednesday from 3:30 p.m. to 8 p.m., and Friday from 5 p.m. until Sunday at 6 p.m."

On September 14, 2001, Mother filed a complaint to modify the custody order, wherein Mother requested primary physical custody of the parties' minor children. On October 22, 2001, during a conciliation conference before the hearing officer, Mother conceded that her request should be limited to a modification of her periods of partial physical custody and that she was not requesting a change of primary physical custody. Nevertheless,

Father, by petition filed on January 9, 2002, requested that the hearing be held before the court.

Following an opportunity for hearing on Father's petition and based upon Mother's assurances that she was not requesting a change of primary physical custody, the court denied Father's petition for a hearing before the court, remanded Mother's custody petition to the hearing officer to conduct a hearing, and ordered that any "relief requested [by Mother], and any relief granted, shall be limited and confined to a request for modification of Mother's periods of partial physical custody" and not a request for a change in primary physical custody. (Order of court dated February 20, 2002.) The only issue presented to the hearing officer was whether Mother's periods of partial physical custody should be enlarged during the week Father worked swing shift. The testimony presented to the hearing officer focused on this issue and was not a full-blown custody hearing.

Upon conclusion of the proceeding before the hearing officer, the officer submitted a report, recommendation, and proposed order to the court which recommended that Mother's periods of physical custody include custody of the children from Monday at 3 p.m. until Friday at 5 p.m. during the week Father works swing shift. Father filed timely exceptions to the report, recommendation, and proposed order of the hearing officer.

After briefs and oral argument thereon, this court denied and dismissed the Father's exceptions and entered a custody order, dated December 30, 2002, which adopted the recommendation of the hearing officer. The same order integrated the prior custody orders of October 20, 1999 and May 5, 2000.

On January 28, 2003, Father filed an appeal of our decision to the Superior Court. In response to our Rule 1925(b) order requesting Father to file a concise statement of matters complained of on appeal, Mother filed a statement on February 11, 2003, listing 25 matters ostensibly complained of.[1]

## DISCUSSION

We decline to address the merits of those issues numbered 16, 19 and 20 which merely present bare assertions and lack fully developed arguments.[2] *Commonwealth v. Drew,* 353 Pa. Super. 632, 634, 510 A.2d 1244, 1245 (1986) ("When issues are not properly raised and developed in briefs, when the briefs are wholly inadequate to present specific issues for review, a court will not consider the merits thereof.").

The remaining issues present a modicum of legal argument and support.[3] Underneath these seemingly diverse

1. The first 23 matters listed correspond with the 23 exceptions Father filed to the hearing officer's report. An additional two issues numbered as 24 and 25 were added to the Father's list.

In requesting the Father to set forth in a concise statement the matters he intended to pursue on appeal, it was hoped that the Father would narrow and focus on those issues which the Father believes are most meritorious. In this respect, our Supreme Court has stated on a number of occasions that the hallmark of effective appellate advocacy is the winnowing of issues and the ability to select and focus on dispositive issues. See *Commonwealth v. Lambert,* 568 Pa. 346, 797 A.2d 232, 244 (2001) (plurality opinion).

2. Additionally, issues 19 and 20 were addressed in the custody order. See order of court dated December 30, 2002, paragraph 4(a). Issue 16 challenges the court's decision to divide the costs of the proceedings between the parties on an equal basis.

3. Although waived, because not preserved by exception, issues 24 and 25 identified in Father's precise statements of matters complained

claims lays one assertion, that the hearing officer, in various aspects, abused his discretion. Father's allegations of abuse fall into two broad categories: one, by failing to permit Father to elicit various testimony, the hearing officer failed to conduct a full hearing (issues 1, 7, 10, 14, 17 and 22); and, two, in recommending the Mother be awarded partial physical custody from 3 p.m. on Monday until 5 p.m. on Friday during the week Father works swing shift, the hearing officer acted contrary to the best interests of the children. (Issues 2-6, 8, 9, 11, 12, 13, 15, 18, 21 and 23-25.)

### *Allegation That Custody Hearing Officer Failed To Conduct a Full Hearing*

Father asserts that the hearing officer abused his discretion by limiting the testimony Father desired to present regarding: Mother's child support arrears (issue 1); Mother's credibility and motive for seeking the requested modification, and the appropriateness of Mother's chosen caregiver (issue 10); Mother's alleged refusal to cooperate with Father (issue 14); and Father's work schedule. (Issue 22.) In consequence, Father claims he was prohibited from developing a complete record. (Issues 7 and 17.)

Father asserts, repeatedly, that the fact-finder must consider all facts, circumstances, and relevant factors prior to rendering a decision that affects the child custody arrangement. *McAlister v. McAlister,* 747 A.2d 390, 391 (Pa. Super. 2000). Despite these repetitious assertions

---

of, overlap with issues 13 and 15, the prior subject of exceptions, and will be addressed.

(see issues 1, 7, 10, 14, 17 and 22), Father fails to cite to the record or state explicitly which facts, circumstances and relevant factors he was denied the opportunity to present, and how, if given the chance to present the information, such testimony would alter the fact-finder's assessment that the best interests of the children will be promoted by permitting Mother to serve as partial physical custodian during the nights Father works swing shift.

In further reference to issues 1 and 14, when objections were sustained to the Father's questions directed to eliciting evidence of the amount of support arrears owed by the Mother and a previous finding of contempt against the Mother, the hearing officer, without objection from either party, indicated that he would take judicial notice of those proceedings. (N.T., pp. 38-39 and 54-55.) Father has not suggested that this did not occur, nor did Father present any offer of proof as to what evidence he intended to present. (N.T., pp. 38-39, 54-55, 62-63, 94.) *Romeo v. Manuel,* 703 A.2d 530, 533 (Pa. Super. 1997) ("In order to preserve an objection to the exclusion of testimony the party seeking to have the testimony admitted must make an offer as to what the testimony is going to establish.").[4]

---

4. In the context of this discussion, we note that the court does not have the authority to sua sponte take judicial notice of proceedings in cases other than those at bar and that the parties must be provided an opportunity to deny the existence and conclusive effect of the record of other proceedings. "[A] court may not ordinarily take judicial notice in one case of the records of another case, whether in another court or its own, even though the contents of those records may be known to the court." *220 Partnership v. Philadelphia Electric Co.,* 437 Pa. Super. 650, 656, 650 A.2d 1094, 1097 (1994). (citations and quotations omitted).

Insofar as the maternal grandmother serving as Mother's surrogate caregiver (issue 10), no offer of proof was made with respect to excluded testimony. (N.T., p. 95.) The record demonstrates that the maternal grandmother has served as caregiver for the parties' minor children, as needed, from the commencement of the initial custody order. (N.T., p. 95.) Prior to Mother's present modification petition, Father did not object to the maternal grandmother functioning as a surrogate caregiver.

Moreover, the record demonstrates that the maternal grandmother's role as surrogate caregiver is minimal and occurs, primarily, during the brief lapse in time between Mother's departure for work and children's departure for school. (N.T., pp. 23-24, 55.) The eldest child was 14 years of age on the date of the hearing and is, presumably, able to assist the maternal grandmother during the minimal time period in which she is the caregiver.

Father's challenge concerning the credibility and motive of Mother (issue 10), is dubious given the parties' mutual litigious history against one another and casts aspersions upon Father's own motive and credibility. (See custody report, findings 3 through 7 and Discussion, page 42 ("Father was disingenuous relative to his work schedule."); see also, discussion below regarding credibility determinations by the hearing officer.)

With respect to issue 22, governing Father's work schedule, the record contains documentation from Father's employer that Father works a rotating shift schedule and will continue to do so, despite Father's attempt to be placed, permanently, on the day schedule, that is from 7 a.m. until 3:30 p.m. (Exhibit P-1.) Again, the record is devoid of any offer of proof on this matter.

"[A] parent's ability to care for a child must be determined as of the time of the custody hearing, not as of an earlier time." *Wiseman v. Wall*, 718 A.2d 844, 847 (Pa. Super. 1998). Accordingly, the hearing officer did not abuse his discretion or commit an error of law in centering the scope of the relevant inquiry upon the appropriateness, at the time of the hearing, of Mother maintaining physical custody during the week Father works swing shift.

### *The Hearing Officer Did Not Fail To Properly Consider Father's Status As Primary Physical Custodian or the Stability of the Existing Arrangement*

Father's remaining issues aver that the hearing officer failed to properly consider Father's status as primary physical custodian and improperly recommended Mother be provided custodial privileges each weeknight on which Father works the swing shift. (See issues 2-6, 8, 9, 11, 12, 13, 15, 18, 21 and 23-25.)

Preliminarily, it should be noted that the hearing officer did not exceed his authority. The officer was directed, by order of court, to confine relief, if any, to a modification of Mother's periods of partial physical custody. (Order of court dated February 20, 2002.)

Father's claim that despite nomenclature, the real effect of the hearing officer's recommendation is to transfer primary physical custody of the children to the Mother is mistaken. (Issue 13, 15, 24 and 25.) Unfortunately, Father reaches this conclusion without any reference to the record or analysis of the facts.

To begin, Father claims that during a two-week period, Mother has the children overnight for eight days. (Issue 13.) This is incorrect. During a two-week period, Mother has seven overnights with the children: four during Father's week on swing shift, one during his day shift week, and two during Mother's weekend period of partial custody. It should also be noted that Father fails to provide any legal authority to support his apparent proposition that primary physical custody is determined by the number of overnight visits.[5]

Neither the Child Custody Act nor the Rules of Civil Procedure define primary physical custody. See 23 Pa.C.S. §5302; Pa.R.C.P. 1915.1(b). Assuming that the primary physical custodian is the person awarded physical custody of a child for more than 50 percent of the time, then, both in fact and in name, Father continues to be the primary physical custodian. During a 14-day schedule, according to our calculations, Mother's period of partial physical custody with the children will be less than 50 percent of the total time. The majority of this time, Father continues as the custodian of the children and is specifically identified in the custody order as being the primary physical custodian. (Order of court dated December 30, 2002, paragraph 1.)

Before addressing Father's remaining issues, we note that when a custody proceeding is heard before a hearing officer, with argument on exceptions before a judge,

---

5. On this issue, Father may be confusing the allocation of child support obligations with a custody proceeding. See Pa.R.C.P. 1910.16-4(c) (substantial or shared physical custody) ("For purposes of this provision, the time spent with the children shall be determined by the number of overnights they spend during the year with obligor.").

"[a]lthough advisory, the hearing officer's report and recommendations are given the fullest consideration particularly on the issue of credibility of witnesses, which the trial court is not empowered to second- guess." *T.B. v. L.R.M.,* 753 A.2d 873, 881 (Pa. Super. 2000) (en banc), *aff'd,* 567 Pa. 222, 786 A.2d 913 (2001). The function of the trial court is to make an independent review of the record to determine whether the hearing officer's findings and recommendations are appropriate. *Id.* at 881. In custody proceedings, as in trial proceedings generally, the officer before whom the record hearing is held is in the best position to observe the proceedings and the demeanor of the witnesses and, therefore, to determine the credibility and motive of each party. *Swope v. Swope,* 455 Pa. Super. 587, 590, 689 A.2d 264, 265 (1997).

The issue the hearing officer was asked to address in this case was extremely narrow. The previous order provided that when Father worked the swing shift, from 3:30 p.m. until 12 a.m., Mother would return the children to his home by 8 p.m. on Monday. During this same week, Mother also had custody from Tuesday at 3 p.m., the end of the school day, until the start of school on Thursday, and then, again, after school on Friday until 8 p.m. Because this schedule interrupted the children's extracurricular activities and homework while they were in Mother's care, and required their return to the Father's home at a time when he was not present and would not be returning until after the children were in bed, Mother requested that the order be revised to permit the children to spend these evenings with her. Father argued that his position as primary caretaker and the development of a stable, continuous and strong relationship between him

and the children dictated against providing the Mother with additional time during the week Father works the swing shift.

While both of these factors merit positive consideration from the fact-finder, the paramount concern in any custody proceeding is the best interests of the children. *Moore v. Moore,* 535 Pa. 18, 30, 634 A.2d 163, 169 (1993).[6] "[T]he concept of a child's best interests is a legal concept . . . ." *T.B. v. L.R.M., supra* at 889. Father does not contest the standard, he challenges that the best interests do not lie with Mother retaining physical custody in preference to returning the children to Father's residence and the care of his girlfriend. (N.T., pp. 77-78, 82, 100-102, 115.)

Both parents love and have a strong relationship with their children and exhibit, commendably, a desire to maximize the time that each is able to spend with their sons. The record also demonstrates that each parent, during their respective periods of custody, can sufficiently meet the "physical, intellectual, moral and spiritual well-being" of the children. *Tripathi v. Tripathi,* 787 A.2d 436, 442 (Pa. Super. 2001) (noting that a best interests analysis includes a consideration of factors that affect a child's whole well-being).

The very narrow issue in this case was whether expanding the Mother's period of partial physical custody

---

6. "The paramount concern in a child custody case is the best interests of the child, based on a consideration of all factors that legitimately affect the child's physical, intellectual, moral and spiritual well-being." *Swope v. Swope,* 455 Pa. Super. 587, 591, 689 A.2d 264, 265 (1997). All other considerations are subordinate. *Clapper v. Clapper,* 396 Pa. Super. 49, 54, 578 A.2d 17, 20 (1990).

to provide overnight stays during the week Father worked the swing shift would be in the best interests of the children. On this issue, Mother presented credible evidence that returning the children to Father's residence by the time mandated in the custody order, and into the custody of a surrogate caregiver, often disrupted the children's participation in extracurricular activities and denied Mother the opportunity of engaging in evening nurturing with her sons, the younger children especially, such as preparation for bed—baths and story reading. (N.T., pp. 15-20, 34.)

Jonathan Petrole, the second eldest son, stated that difficulty arose when it was necessary to leave an activity to return timely into Father's custody. (N.T., p. 122.) The older children, Nicholas Jr. and Jonathan, ages 14 and 13 on the date of the hearing, did not oppose the suggestion that they spend the evenings with their Mother during the week Father works the swing shift. (N.T., pp. 117, 122-24.)

Under the former order of shared custody, both parents were active in the children's lives and this will continue under the new order. (N.T., p. 26.) The parties themselves live approximately two miles from one another. (N.T., p. 68.) Frequent and continuing physical contact with both parents is the hallmark of a shared custody order. Indeed, "it is the public policy of this Commonwealth, when in the best interest of the child, to assure a reasonable and continuing contact of the child with both parents . . . and the sharing of the rights and responsibilities of child rearing by both parents . . . ." Child Custody Act, Declaration of Policy, 23 Pa.C.S. §5301.

The continuity in the children's lives has been the sharing of the rights and responsibilities of parenthood between both parents. The revised order continues this history of parental participation and involvement established by the order of October 20, 1999, as revised by the order of May 5, 2000.

Significantly, the primary caretaker doctrine upon which the Father relies heavily is, most importantly, concerned with "the quality and quantity of care actually given to the child by the parent as opposed to the supervisory care by others while in the parent's custody." *Wiseman v. Wall, supra* at 847. Both parents work. Although there is some amount of time during each parent's periods of physical custody when the children must be under the care of a surrogate provider, the time during Mother's periods of custody is minimal relative to the hours of surrogate care the children receive when Father works the swing shift. This factor, coupled with the testimony of the children and the present ability of Mother to provide parental nurturing and care during the nights Father works the swing shift, supports the report and recommendation of the hearing officer.

## CONCLUSION

Absent a determination that one parent is unfit, it is generally within the best interests of the parties' children to assure reasonable and continuing contact between the children and both parents, and the sharing of the rights and responsibilities of child rearing by both parents. The strength and stability of the relationship between parents and their children is of the utmost importance. *Clap-*

*per v. Clapper,* 396 Pa. Super. 49, 54, 578 A.2d 17, 19 (1990). What custodial arrangement will best serve this goal is dynamic, depending in part on the growth and development of the children, as well as the circumstances of their parent's lives.

Here, the circumstances favor the Mother's request. For this reason, we accepted and adopted the recommendation of the hearing officer and permitted the Mother to have overnight visits with her children during the week Father works the swing shift. In doing so, our focus has been the best interests of the children and not the respective rights of the contesting parties. *T.B. v. L.R.M., supra* at 890.