J-A29017-21

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| JACOB C. PENZERRO | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| JULIA B. GADD | : | |
| | : | |
| Appellant | : | No. 898 WDA 2021 |

Appeal from the Order Entered July 12, 2021
In the Court of Common Pleas of Mercer County
Civil Division at No(s): 2019-00074

BEFORE:   BENDER, P.J.E., BOWES, J., and PELLEGRINI, J.[*]

MEMORANDUM BY BOWES, J.:                **FILED: March 15, 2022**

Julia B. Gadd ("Mother") appeals from the July 12, 2021 custody order denying her request to relocate with her daughter, L.C.P., from Brookfield, Ohio, to Cambridge Springs in Crawford County, Pennsylvania.  We affirm.

L.C.P. was born in January of 2015, to Mother and Jacob C. Penzerro ("Father"), who never married but cohabited in southwestern Mercer County, Pennsylvania, from L.C.P.'s birth until she was approximately three years old.[1] N.T., 5/28/20, at 11.   Mother eventually moved to Brookfield, Ohio, approximately twenty minutes northwest of Father's home.  *Id*. at 9, 37; N.T., 6/7/21, at 99.

_____

[*]  Retired Senior Judge assigned to the Superior Court.

[1]  Father entered into a lease-to-own housing arrangement in August of 2019. N.T., 6/7/21, at 99.

After separating, the parties exercised shared physical custody on an alternating weekly basis without court intervention. On January 10, 2019, Father filed a custody complaint and a petition for special relief in the Mercer County Court of Common Pleas, wherein he requested that the court award shared legal and physical custody. By consent order dated January 24, 2019, the court awarded the requested custody arrangement. The custody schedule remained in effect through the subject proceedings.[2]

In February of 2020, Mother and Father took L.C.P. to the pediatrician located in Howland, Ohio, because they noticed that her "balance [was] off." N.T., 5/28/20, at 21-22, 23-24. The pediatrician recommended that they take L.C.P. to a neurologist at Akron Children's Hospital in Akron, Ohio, where she eventually was diagnosed with Friedreich Ataxia ("FA") and left ventricular hypertrophy. *Id*. at 21; N.T., 6/7/21, at 15-17. Mother testified that FA is a genetic, chronic, and progressive disease for which there is no treatment. N.T., 6/7/21, at 15-16. She explained, "it affects your muscles. You will lose balance. It affects your heart, your spine. [You] can get scoliosis, diabetes.

---

[2] The court set forth a holiday and school schedule directing, "Commencing with the 2019-2020 school year, the child shall be enrolled in the Joseph Badger Preschool located in Kinsman, Ohio." Order, 6/24/19, at ¶ 3. It ordered that custody exchanges occur at the Brookfield Township Police Department thirty minutes prior to the start of school, and that Mother shall be responsible for transporting L.C.P. to and from school and the place of the custody exchange. Finally, the court directed that it "shall exercise continuing exclusive jurisdiction over the parties, the child, and all matters of custody involving the child." *Id*. at ¶ 6.

Your hearing, your speech. It's like pretty much everything in her body except for her mental, intellectual state." *Id*. at 16. With respect to the left ventricular hypertrophy, Mother testified it is related to FA, and is likely a progressive condition making the left side of L.C.P.'s heart thicker than normal. *Id*. at 16-17. Mother and Father agree that L.C.P.'s disease will result in a reduced life expectancy of approximately age thirty-five. *Id*. at 17, 119.

This appeal arises from Mother's proposed relocation from Brookfield to Cambridge Springs, Pennsylvania, which is approximately one hour northeast of Father's residence. Father filed a counter-affidavit objecting to the proposed relocation and modification of the existing custody order. The relocation hearing occurred on May 28, 2020. By that date, L.C.P.'s FA diagnosis was suspected, but not confirmed, by her neurologist. N.T., 5/28/20, at 21.

During the relocation hearing, Mother testified that she proposed to relocate from Brookfield to the home of her fiancé, I.U. ("Fiancé"), in Cambridge Springs, which she estimated was "45 minutes" from Father's home. *Id*. at 32, 37. She relayed that her family resides in Champion, Ohio, which is approximately thirty minutes from her current home in Brookfield, but one and one-half hour from the proposed abode in Cambridge Springs. *Id*. at 44. Mother stated that Fiancé's family also lives in Crawford County,

and that he has a close relationship with them. *Id*. She also noted that Father's family resides in Mercer County. *Id*.

Mother proposed a new physical custody schedule where Father would have custody three weekends per month during the school year and alternating weeks during the summer. *Id*. at 47. After the move, Father would not exercise physical custody on weekdays during the academic year. She also proposed a new custody exchange location at the state police barracks in Mercer, which she estimated was fifteen to twenty miles from Father's home. *Id*. at 48.

However, Mother stated that she would maintain her home during the 2020/2021 school year because she would like L.C.P. to attend kindergarten in the Joseph Badger School District, where she was then employed as a classroom assistant and wanted to remain for the next school year. *Id*. at 12-13, 36-37, 60. She testified that she planned to stay in her home during the school week and live with her boyfriend on the weekends during the 2020/2021 school year. *Id*. at 61. Mother anticipated finding different employment at the conclusion of the school year, possibly in the Cambridge Springs Elementary school, where she planned to transfer L.C.P. for first grade. *Id*. 13, 36-37.

Mother observed that L.C.P. loves Father, and the trial court interviewed the child, then five years old, who confirmed those feelings. *Id*. at 31. The court found, *inter alia*, L.C.P. "indicated that if she would see her dad less than

the current time she would feel 'a little sad.'" *Id*. at 8. Neither party disputed the trial court's finding of fact. *Id*. at 7-8.

The trial court stated on the record at the conclusion of the testimonial evidence that, "in light of some of the testimony regarding [Mother]'s scheduled planned move[,] . . . [t]he [c]ourt has indicated a belief that the second part of this hearing should be closer to the actual full proposed move, and the parties have agreed." *Id*. at 62. Thus, the court ordered the hearing continued until February 26, 2021, and provided, *inter alia*, "the continuation of this [hearing] does not imply or prevent [M]other from spending weekends, evenings, or holidays with [Fiancé], so long as it does not diminish or interfere with [Father]'s scheduled custody times." Order, 5/28/20, at 2.

However, by order dated February 26, 2021, the court denied Mother's relocation request without prejudice, finding that "continuation of the hearing to February 26, 2021, inadvertently violates Pa.R.C.P. 1915.4." Order, 2/26/21, at ¶ 6; *see also* Pa.R.C.P. 1915.4(c) (Prompt Disposition of Custody Cases) (providing, in part, "Trials and hearings shall be scheduled to be heard on consecutive days whenever possible but, if not on consecutive days, then the trial or hearing shall be concluded no later than 45 days from commencement.").

Thereafter, Mother served Father with another notice of proposed relocation to Cambridge Springs, and Father filed his counter-affidavit on March 8, 2021. A second hearing occurred on June 7, 2021, during which the

court incorporated the transcript from the May 28, 2020 relocation hearing. N.T., 6/7/21, at 6. Mother acknowledged on inquiry by the trial court during this hearing that Father's home is approximately fifty to fifty-five minutes away from Cambridge Springs. *Id*. at 39.

By the time of this hearing, L.C.P. was six years old and scheduled to start first grade in the fall of 2021. *Id*. at 11. L.C.P.'s diagnoses were confirmed, and her specialists were located at Akron Children's Hospital in Akron, Ohio. *Id*. at 15-16, 18. Mother testified that L.C.P. currently "has issues with balance. She has to wear orthotic braces on her ankles to keep her more stable." *Id*. at 16. With respect to L.C.P.'s left ventricular hypertrophy, Mother explained, "her stamina is so low so her heart has to work overtime. So the left side of it is thicker than it's supposed to be. Right now[,] it's mild, but it's probably going to get worse as she grows older." *Id*. at 17. Mother testified that L.C.P. receives physical and occupational therapy at her school and at Akron Children's Rehabilitation in Howland, Ohio, and she agreed on cross-examination that L.C.P. "has a rapport" with her therapists, who, at the time of the hearing, she had been working with for more than one year. *Id*. at 21, 50. With respect to the anticipated progression of L.C.P.'s disease, Mother stated, "her physical therapist and her neurologist believe that she will need a wheelchair within the next five years." *Id*. at 17.

In addition, by the June 7, 2021 relocation hearing, Mother was pregnant and due to give birth in October. *Id*. at 7. She and Fiancé were

engaged to be married. *Id*. Mother maintained her employment in the Joseph Badger School District, and she planned to leave the position if her relocation request was granted. *Id*. at 9. Mother testified that she will take maternity leave whether or not the court grants her relocation request. *Id*. at 10. She was also enrolled in online college courses for a degree involving teacher education, and she planned to take an increased number of courses during her maternity leave. *Id*. at 9-10.

Mother presented the testimony of Fiancé, who attested that regardless of the court's relocation decision, he and Mother will marry, although they do not have a date set. *Id*. at 79, 91. Fiancé stated that he purchased his home in Cambridge Springs in June of 2019, which Mother confirmed was after they were dating and after the court issued the custody order establishing the equally shared custody schedule. *Id*. at 60-61, 78. He works in Meadville Pennsylvania, approximately fifteen minutes from his home. *Id*. at 80-81. Fiancé testified on cross-examination that it is possible for him to relocate to an area convenient to both his workplace and the existing custody schedule. *Id*. at 91-92. Indeed, he noted that he and Mother "kicked around the idea" of this alternative. *Id*. at 92. On redirect examination, Fiancé testified that it would not be a financial hardship to sell his home and purchase another one, "[b]ut it would not be preferable as we spent the last couple years really making this house what we wanted it to be as a family." *Id*. at 95. He explained that they remodeled the house, "got everything looking nice; new

electrical." *Id*. at 84. However, he indicated that the remodeling did not include making the house handicap accessible. *Id*. at 84. Fiancé stated, "Once L.C.P. gets to that point [of needing a wheelchair], there is going to be some [ramps]." *Id*. He explained, with the exception of the bathroom on the main floor, the "main floor actually right now is completely handicap accessible. It's all flat from the bedroom to the bathroom. There's no steps or anything in between." *Id*.

Father testified on his own behalf. He described his house, in part, as "a three-bedroom two-bathroom ranch-style house. It already has a handicap-accessible bathroom, walk-in shower seat. I need two steps to make a ramp from the outside into the house." *Id*. at 100. Father testified that, as of this year, he is self-employed as a certified mechanic, and his mechanic's garage is ten feet away from his house. *Id*. at 100-101. Father explained that he became self-employed in order to create his own schedule and be more available for L.C.P., particularly with respect to her therapy sessions. *Id*. at 111. Prior to that, Father worked six days per week as an hourly employee at a mechanic's garage in West Middlesex, for which he was required to request vacation time at least two weeks in advance. *Id*. at 107-108.

Father testified that his brother and sister-in-law, and their four children, also live in Brookfield, "which is about ten minutes away" from Mother's current residence. *Id*. at 101. The cousins range in age from two to seven, and he stated L.C.P. "is very active with all the children." *Id*. at

102. Father explained, "I'm sharing my [custody] time with my family" because those relationships are important for L.C.P. *Id*. at 103.

On July 12, 2021, the trial court filed its "Findings and Order" denying Mother's relocation request. Mother timely filed a notice of appeal and a concise statement of errors complained of an appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b). The trial court complied with Rule 1925(a), filing its opinion (hereinafter cited as "Trial Court Opinion") on August 13, 2021.

Mother presents the following issues for review:

1. Did the [t]rial [c]ourt err and abuse its discretion in denying [Mother's] request to relocate with [L.C.P.] from Brookfield, Ohio to Cambridge Springs, Crawford County, Pennsylvania in that it disregarded the weight of the evidence when considering the relocation factors[?]

2. Did the [t]rial [c]ourt err and abuse its discretion in disregarding the facts that Mother has provided the majority of [L.C.P.]'s medical care for her recently diagnosed condition, that both Mother and [L.C.P.]'s financial and emotional conditions would be improved and more stable following the requested move, that Mother's current residence will not accommodate [L.C.P.] once she is forced to use a wheelchair[,] and that Mother would be able to stay at home to care for [L.C.P.] if permitted to relocate rather than returning to full[-]time employment in the fall[?]

3. Did the [t]rial [c]ourt err and abuse its discretion in placing undue negative weight on the fact that the travel time to [L.C.P.]'s neurologist would be increased by 45 minutes and that Mother would need to find a new pediatrician and therapists for the child[?]

4. Did the [t]rial [c]ourt err and abuse its discretion in placing undue weight on Mother's fiancé's statement that he could sell the home that he recently purchased and made extensive improvements to and possibly find housing closer to Father's home[?]

- 9 -

5. Did the [t]rial [c]ourt err and abuse its discretion in disregarding the fact that Mother's custody proposal would increase Father's quality time with [L.C.P.] on the weekends and alleviate the need for placing her in childcare when in Father's custody[?]

Mother's brief at 4-5.

We review Mother's issues according to the following scope and standard

of review:

> [T]he appellate court is not bound by the deductions or inferences made by the trial court from its findings of fact, nor must the reviewing court accept a finding that has no competent evidence to support it. . . . However, this broad scope of review does not vest in the reviewing court the duty or the privilege of making its own independent determination. . . . Thus, an appellate court is empowered to determine whether the trial court's incontrovertible factual findings support its factual conclusions, **but it may not interfere with those conclusions unless they are unreasonable in view of the trial court's factual findings**;[3] and thus, represent a gross abuse of discretion.

_____

[3] The learned dissent proffers three bases to find trial court error, *i.e.*, the trial court failed to: 1) address whether Mother's proposed relocation served the best interests of L.C.P.; 2) consider the interest of all the parties; and 3) make factual conclusions that were supported by the evidence. **See** Dissenting Memorandum at 2. Not one of these contentions is compelling. Concerning the first assertion, as discussed in the body of this memorandum, the trial court did, in fact, perform the statutorily mandated best-interests analyses outlined in 23 Pa.C.S. §§ 5328(a) and 5337(h). We address the propriety of the dissent's desire to weigh "the interests of all the parties" in footnote four. As to the dissent's final basis to find error, the certified record clearly supports the trial court's legal conclusions, which are unassailable unless unreasonable based on the **trial court's findings of fact**. Here, the trial court concluded, *inter alia*, that "Mother proposed to double the drive time to . . . Akron Children's Hospital" and "Fiancé unequivocally testified he is willing to relocate closer to [F]ather[,] and there is no financial hardship in doing so." Trial Court Opinion, 8/13/21, at 6, 8. The dissent determines that the trial court's

> ***R.M.G., Jr. v. F.M.G.***, 986 A.2d 1234, 1237 (Pa.Super. 2009)
> (quoting ***Bovard v. Baker***, 775 A.2d 835, 838 (Pa.Super. 2001)).
> Moreover,
>
> > [O]n issues of credibility and weight of the evidence, we
> > defer to the findings of the trial [court] who has had the
> > opportunity to observe the proceedings and demeanor of
> > the witnesses.
> >
> > The parties cannot dictate the amount of weight the trial
> > court places on evidence. Rather, the paramount concern
> > of the trial court is the best interest of the child. Appellate
> > interference is unwarranted if the trial court's consideration
> > of the best interest of the child was careful and thorough,
> > and we are unable to find any abuse of discretion.
>
> ***R.M.G., Jr., supra*** at 1237 (internal citations omitted). The test
> is whether the evidence of record supports the trial court's
> conclusions. ***Ketterer v. Seifert***, 902 A.2d 533, 539 (Pa.Super.
> 2006).

***A.V. v. S.T.***, 87 A.3d 818, 820 (Pa.Super. 2014) (emphasis added).

We have explained, "It is not this Court's function to determine whether

the trial court reached the 'right' decision; rather, we must consider whether,

'based on the evidence presented, given [sic] due deference to the trial court's

weight and credibility determinations,' the trial court erred or abused its

discretion. . . ." ***King v. King***, 889 A.2d 630, 632 (Pa.Super. 2005) (quoting

***Hanson v. Hanson***, 878 A.2d 127, 129 (Pa.Super. 2005)). This Court has

recognized that "the knowledge gained by a trial court in observing witnesses

---

conclusions are unreasonable in light of **the dissent's own fact finding**
concerning the duration of the trips to Akron and the potential hardships
associated with Fiancé's willingness to move. In this manner, it misapplies
our standard of review.

- 11 -

in a custody proceeding cannot adequately be imparted to an appellate court by a printed record." **Ketterer**, **supra** at 540 (quoting **Jackson v. Beck**, 858 A.2d 1250, 1254 (Pa.Super. 2004)).

With respect to custody cases, the primary concern is the best interests of the child. "The best-interests standard, decided on a case-by-case basis, considers all factors that legitimately have an effect upon the child's physical, intellectual, moral, and spiritual wellbeing." **Saintz v. Rinker**, 902 A.2d 509, 512 (Pa.Super. 2006).[4]

_____

[4] As noted, *supra*, the dissent endeavors to balance the interests of all the parties in an attempt to fashion a "more sustainable" custody arrangement. **See** Dissenting Memorandum at 2, 15 (finding, the trial court erred, in part, "[b]y failing to consider the interests of all the parties[.]"). In so doing, however, the dissent loses sight of the polestar in child custody cases, *i.e.*, serving the best interests of the child. **See Graves v. Graves**, ____ A.3d ____, 2021 WL 4839479, at *8 (Pa.Super. October 18, 2021) ("The paramount focus is the best interest of the child involved, **not the respective rights of the contesting parties**.") (emphasis added) (quoting **T.B. v. L.R.M.**, 753 A.2d 873, 889-890 (Pa. Super. 2000) (*en banc*)). The dissent's misapprehension of this guiding principle is further evidenced by its criticism of the trial court's desire to preserve the existing custody arrangement, which the certified record confirms is serving L.C.P.'s best interest, and its statement equating the custody court's consideration of Fiancé's willingness to move to a mutually convenient locale with a civil court's consideration of subsequent remedial measures in a negligence action. **See** Dissenting Memorandum at 12, 13-14.

Stated plainly, the trial court concluded that Mother failed to satisfy her burden of proving that relocation to Cambridge Springs served her daughter's best interests. Rather than follow our mandate to scour the certified record to determine whether the trial court's conclusion was manifestly unreasonable or the product of partiality, prejudice, bias, or ill will, the dissent elects to re-weigh the evidence from its perspective. This inherently subjective approach disregards our standard of review. As noted in the body of this memorandum, we are not concerned with whether the court made the "right" decision;

- 12 -

Child custody actions are governed by the Child Custody Act ("Act"), 23 Pa.C.S. §§ 5321-5340. As the party proposing relocation, Mother had the burden of proving that relocation will serve L.C.P.'s best interest as set forth in § 5337(h), which provides as follows.[5]

> **(h) Relocation factors.--**In determining whether to grant a proposed relocation, the court shall consider the following factors, giving weighted consideration to those factors which affect the safety of the child:
>
> (1) The nature, quality, extent of involvement and duration of the child's relationship with the party proposing to relocate and with the nonrelocating party, siblings and other significant persons in the child's life.
>
> (2) The age, developmental stage, needs of the child and the likely impact the relocation will have on the child's physical, educational and emotional development, taking into consideration any special needs of the child.
>
> (3) The feasibility of preserving the relationship between the nonrelocating party and the child through suitable custody arrangements, considering the logistics and financial circumstances of the parties.

---

instead, we review for an abuse of discretion. ***King v. King***, 889 A.2d 630, 632 (Pa.Super. 2005). It is beyond peradventure that this Court will not find an abuse of discretion merely because we would have reached a different conclusion than the trial court. ***R.L. v. M.A.***, 209 A.3d 391, 395 (Pa.Super. 2019).

[5] Contrary to the dissent's protestations, § 5337(h) does not require consideration of the parties' respective interests beyond any derivative effects those interests might have on L.C.P. As to § 5337(h)(6), the trial court found that Mother established that the proposed relocation would enhance her quality of life, but it ultimately concluded that the benefit to Mother was offset by other evidence, including Fiancé's willingness to remove the primary impediment to L.C.P.'s ability to maintain her current relationship with Father. That determination falls squarely within the trial court's purview.

(4) The child's preference, taking into consideration the age and maturity of the child.

(5) Whether there is an established pattern of conduct of either party to promote or thwart the relationship of the child and the other party.

(6) Whether the relocation will enhance the general quality of life for the party seeking the relocation, including, but not limited to, financial or emotional benefit or educational opportunity.

(7) Whether the relocation will enhance the general quality of life for the child, including, but not limited to, financial or emotional benefit or educational opportunity.

(8) The reasons and motivation of each party for seeking or opposing the relocation.

(9) The present and past abuse committed by a party or member of the party's household and whether there is a continued risk of harm to the child or an abused party.

(10) Any other factor affecting the best interest of the child.

23 Pa.C.S. § 5337(h).

The trial court in this case was also required to consider the custody factors set forth in the Act, as follows.

**5328. Factors to consider when awarding custody.**

**(a)** *Factors.* – In ordering any form of custody, the court shall determine the best interest of the child by considering all relevant factors, giving weighted consideration to those factors which affect the safety of the child, including the following:

(1) Which party is more likely to encourage and permit frequent and continuing contact between the child and another party.

(2) The present and past abuse committed by a party or member of the party's household, whether there is a

- 14 -

continued risk of harm to the child or an abused party and which party can better provide adequate physical safeguards and supervision of the child.

(2.1) The information set forth in section 5329.1(a)(1) and (2) (relating to consideration of child abuse and involvement with protective services).

(3) The parental duties performed by each party on behalf of the child.

(4) The need for stability and continuity in the child's education, family life and community life.

(5) The availability of extended family.

(6) The child's sibling relationships.

(7) The well-reasoned preference of the child, based on the child's maturity and judgment.

(8) The attempts of a parent to turn the child against the other parent, except in cases of domestic violence where reasonable safety measures are necessary to protect the child from harm.

(9) Which party is more likely to maintain a loving, stable, consistent and nurturing relationship with the child adequate for the child's emotional needs.

(10) Which party is more likely to attend to the daily physical, emotional, developmental, educational and special needs of the child.

(11) The proximity of the residences of the parties.
(12) Each party's availability to care for the child or ability to make appropriate child-care arrangements.

(13) The level of conflict between the parties and the willingness and ability of the parties to cooperate with one another.  A party's effort to protect a child from abuse by another party is not evidence of unwillingness or inability to cooperate with that party.

(14) The history of drug or alcohol abuse of a party or member of a party's household.

(15) The mental and physical condition of a party or member of a party's household.

(16) Any other relevant factor.

23 Pa.C.S. § 5328(a); *see also A.M.S. v. M.R.C.*, 70 A.3d 830, 836 (Pa.Super. 2013) (stating that, when making a decision on relocation that also involves a custody decision, "the trial court must consider all ten relocation factors and all sixteen custody factors" outlined in the Act.).

Instantly, in its opinion accompanying the subject order, the trial court set forth its assessment of the ten relocation factors and the sixteen custody factors and delineated the reasons for its decision.[6] Findings and Order, 7/12/21, at 6-15. With respect to the relocation factors, the court found that none favored relocation. Specifically, the court weighed § 5337(h)(1), (2), and (3) against relocation,[7] and it found the remaining relocation factors

---

[6] The trial court improperly numbered the § 5328(a) custody factors because it inadvertently identified (a)(2.1) as (a)(3). *See* Findings and Order, 7/12/21, at 7. In the argument section of her brief, Mother follows the numbering used by the trial court. In this memorandum, we disregard the improper numbering and refer to the custody factors as set forth in the statute.

[7] In paraphrasing the trial court's discussion of the third relocation factor, the dissent engages in speculation about alternative plans that were never before the court. *See* Dissenting Memorandum at 5. The trial court concluded that the factor militates against the proposed relocation because it would upend the existing shared custody arrangement and impact the treatment of the child's medical condition. *See* Findings and Order, 7/12/21, at 12-13.

- 16 -

neutral. With respect to the custody factors, the court weighed § 5328(a)(4), (5), (7), and (11) in Father's favor. Factors (1), (3), (6), and (10) all militated in favor of Mother. The remaining custody factors were either neutral or inapplicable.

> In its Rule 1925(a) opinion, the court explained:
>
> In consideration of all factors as noted, relocation has been determined to be against the best interests of [L.C.P.]. It is important to note the entire basis of [Mother]'s desire to relocate is to cohabitate with her fiancé. [Mother] is currently pregnant with fiancé's child. There was little to no evidence presented regarding the specific location of the proposed move to Cambridge Springs. The clear import of the hearing [regarding] the location is unimportant to [Mother;] it is the place of abode with fiancé which is important. Fiancé unequivocally testified he is willing to relocate closer to [F]ather[,] and there is no financial hardship in doing so.

Trial Court Opinion, 8/13/21, at 6. The testimony of Mother and Fiancé, detailed above, supports the court's findings. N.T., 5/28/20, at 32; N.T., 6/7/21, at 91-92, 95. In addition, Mother testified:

> Q. [H]ow would your life be improved if you were permitted to move to Cambridge Springs?
>
> A. I would — the stress of this long-distance relationship would be relieved. I would be able to move on and towards a brighter future and give [L.C.P.] a bigger home with lots of yard to play and show her what a loving, supporting, healthy relationship looks like.

_____

Although the court also noted that Father and Fiancé both indicated a willingness to make concessions that might make a different relocation proposal more feasible, the trial court specifically stated that no other alternative proposal was before it. *Id*. at 12. Thus, while the dissent speculates about the potential effects of alternatives that the court explicitly stated it did not consider, those concerns are misplaced. *See* Dissenting Memorandum at 5 n.3.

. . . .

Q. [W]hat improvements would [L.C.P.'s] life have, in your opinion, if you were permitted to move with her?

A. I think she would have more stability, more — I just think having two adults in the household to love and support her would be very beneficial.

N.T., 5/28/20, at 46-47.

In addition, the trial court reasoned in its Rule 1925(a) opinion:

The health issues reinforce this result. [L.C.P.]'s condition is very serious. Mother proposed to double the drive time to the neurologist at Akron Children's Hospital. The evidence clearly establishes [L.C.P.]'s positive relationship with the current occupational therapist and physical therapist. Mother stated in general terms she would find a new therapist, but no investigation into specifics occurred.

Trial Court Opinion, 8/13/21, at 8.

The record supports this finding insofar as Mother testified that, if she relocates to Cambridge Springs, she will keep L.C.P.'s specialist at Akron Children's Hospital, which would be a longer drive by approximately forty-five minutes than from Brookfield. N.T., 6/7/21, at 49, 66. Hence, relocation would extend the duration of one leg of the trip to Akron Children's Hospital from one hour to one-hour and forty-five minutes. *Id*. at 49. Between the child's first appointment in February 2020 and the date of the May 2020 hearing, L.C.P. attended four appointments at Akron Children's Hospital in four months. N.T., 5/28/20, at 24. In the latter hearing, Mother indicated that the child had several doctor appointments, presumably in both Akron and at her

- 18 -

pediatrician and therapists in Howland, Ohio. N.T., 6/7/21, at 18. Thus, while Mother neglected to present current evidence concerning the frequency of the trips to Akron, accounting for the return trips, Mother's proposed relocation would require L.C.P. to endure what amounts to a three-and-one-half-hour roundtrip between Akron and Cambridge Springs for those appointments.

Mother noted that L.C.P.'s primary care doctor is in Howland, Ohio, and she would change that doctor. *Id*. at 65-66. L.C.P.'s physical and occupational therapists are also located in Howland. *Id*. at 49. Mother indicated that L.C.P. has been working with her therapists for more than one year, and she agreed on cross-examination that L.C.P. has a rapport with them. *Id*. at 49-50. Howland is approximately one hour and fifteen minutes from Cambridge Springs and Mother stated that she intends to ask L.C.P.'s specialist whether there are therapists close to Cambridge Springs that they are comfortable working with. *Id*. 49-50, 66-67. However, as of the date of the hearing, Mother had yet to make that inquiry.

Turning to the merits of this appeal, in the argument section of her brief, Mother sets forth her entire argument under one heading where she asserts that the court erred and abused its discretion by "disregard[ing] the weight of the evidence when considering the custody/relocation factors." Mother's brief

at 12.[8]  As such, Mother does not contest the court's factual findings, but the weight it placed on those findings relative to the custody and relocation factors.[9]  We review Mother's arguments collectively.

_____

[8]  We observe that Mother's brief fails to comply with Rule 2119(a), which provides, "The argument shall be divided into as many parts as there are questions to be argued; and shall have at the head of each part — in distinctive type or in type distinctively displayed — the particular point treated therein, followed by such discussion and citation of authorities as are deemed pertinent."  Pa.R.A.P. 2119(a).  However, since the defects do not preclude appellate review, we decline to dismiss the appeal pursuant to Pa.R.A.P. 2101, which provides "if the defects are in the brief or reproduced record of the appellant and are substantial, the appeal or other matter may be quashed or dismissed."

[9]  To the extent that Mother requests that this Court revisit the statutory factors and reach conclusions in her favor, her arguments must fail.  *See* *M.J.M. v. M.L.G.*, 63 A.3d 331, 339 (Pa.Super. 2013) (stating, a party cannot dictate the weight that the trial court attributed to the evidence or its consideration of any single factor).  Nevertheless, the dissent indulges Mother's entreaties, devotes its analysis to a re-evaluation of the evidence concerning select statutory factors, and assigns to those factors the importance that it deems proper.  The fact that the dissent couched its analysis as challenging the trial court's improper considerations of "where L.C.P. received medical treatment and Fiancé's purported willingness to move" is of no moment.  *See* Dissenting Memorandum at 6-7.  Despite this statement, it is clear from the pertinent portions of the dissent's analysis that it simply challenges the weight which the trial court placed upon the facts.  For example, deeming the additional burden on L.C.P. "insignificant," my learned colleague rejects the court's assessment of the evidence.  *Id*. at 8.  Furthermore, in re-weighing the evidence to conclude that the addition of 45 minutes to a biannual trip to Akron is insignificant, the dissent diminishes the duration of the 3½ hour roundtrip between Cambridge Springs and Akron and utterly ignores evidence that L.C.P. previously completed the trip to Akron four times in a four-month period.  N.T., 5/28/20, at 24.  Thus, the dissent's disagreement with the trial court's assessment of this factor is not only an invalid ground to disturb the custody order, it is also unwarranted based upon the evidence presented.  *See R.L.*, *supra* at 395 (this Court will not find abuse of discretion because we would have reached different conclusion than trial

- 20 -

The crux of Mother's contention is that the court abused its discretion in weighing heavily against her the proximity of L.C.P.'s specialist, primary care physician, and specialist to Mother's current residence. Specifically, the court found that "Cambridge Springs is almost two (2) hours from Akron Children's Hospital, the primary location of [L.C.P.]'s treatment and the location of her neurologist. [L.C.P.]'s primary care physician and therapist are within fifteen (15) minutes of [M]other's current location." Findings and Order, 7/12/21, at 16; Mother's brief at 13-16. This finding is implicated in § 5328(a)(10), which party is more likely to attend to the daily physical, emotional, developmental, educational and special needs of the child; (a)(15), the mental and physical condition of a party or member of a party's household; (a)(16), any other relevant factor; and § 5337(h)(2), age, developmental stage, needs of the child and likely impact the relocation on the child's physical education and emotional development taking into account special needs.

Mother argues that the court erred in weighing these factors against relocation while simultaneously finding that she "is more likely to attend to the developmental special needs of [L.C.P.] . . . [because she] has taken most, if not all, actions with regard to [L.C.P.]'s diagnosis, evaluations, examinations, and treatment." Findings and Order, 7/12/21, at 9 (discussing § 5328(a)(10)).

_____

court). We address in footnote ten the dissent's objection to the manner that the trial court considered Fiancé's willingness to move closer to Father.

Mother asserts, without citation to the record, that her "ability to provide this care will be substantially hindered if she is forced to remain in Brookfield and raise two children as essentially a single parent despite her anticipated marriage." Mother's brief at 16. The certified record does not support this contention. Rather, as discussed above, the record supports the court's finding that Mother's fiancé has considered alternatives to relocation and is willing to sell his house and move closer to Father so the current custody schedule may continue, and his plan to marry Mother is not dependent on her relocating to Cambridge Springs. N.T., 6/7/21, at 79, 91-92, 95. Furthermore, the court properly weighed these facts in relation to § 5337(h)(3), the feasibility of preserving the relationship between the nonrelocating party and the child through suitable custody arrangements, considering the logistics and financial circumstances of the parties. The court found, "[G]iven the effect of [L.C.P.]'s neurological condition[,] it further strengthens the need to maximize [her] contact with the parties." Findings and Order, 7/12/21, at 12. We discern no abuse of discretion.

Mother also asserts, again without citation to the record, that she "will continue to provide the care [L.C.P.] needs now and will increasingly need in the future, something that Father has not shown a willingness or ability to provide." Mother's brief at 16. In addition, she baldly asserts, "Father has made it abundantly clear that his priority is his work and secondarily [L.C.P.]

by his failure to meaningfully participate in her diagnosis and treatment." *Id*. at 20-21. The record does not support these assertions.

With respect to the frequency of L.C.P.'s physical and occupational therapy, Mother testified that her daughter receives physical therapy in periodic monthly bursts. *See* N.T., 6/7/21, at 21 ("for like two months at a time she'll go every week and have two months off."). The "occupational therapy is usually every other week." *Id*. Mother testified that the majority of L.C.P.'s physical therapy appointments are scheduled on Tuesdays, which are her custodial days. *Id*. at 22. She stated that, during the most recent Christmas holiday, Father took L.C.P. "to a couple of occupational therapy appointments" because they were scheduled on "his Monday after his weekend." *Id*. at 22-23.

Furthermore, Mother testified that Father failed to attend at least one medical appointment. Prior to L.C.P.'s diagnosis, the specialist ordered a Magnetic Resonance Imaging ("MRI") test at Akron Children's Hospital. N.T., *Id*. at 28. Mother stated that Father "said he was going to be there, but he didn't show up" even though she notified him of the test within a reasonable period of time. *Id*. at 28-29.

Father testified that he did not attend the MRI appointment because he was not informed in a timely manner. He explained, Mother did not notify him "within even a week. So I was trying to move schedules around to be able to attend, but I was not able to." *Id*. at 108-109. As set forth above, Father

then worked for a mechanic in West Middlesex, and he was required to request vacation time at least two weeks in advance. *Id*. at 107-108. He explained that he "ran the garage" with his boss. *Id*. at 108. He stated, "If I wasn't there, the place wasn't open." *Id*. Father further testified that the MRI appointment was at 8:00 a.m., and Akron Children's Hospital is "at least an hour or better" from his home. *Id*. at 109. Father continued that, in 2021, he became self-employed as a mechanic so that he could create his own schedule and be more available for L.C.P. *Id*. at 111. Based on the foregoing, and after review of the totality of the testimonial evidence, we reject Mother's assertion that Father's "priority is his work and secondarily [L.C.P.]. . . ." Mother's brief at 20-21.

Finally, Mother asserts that, by denying her relocation request, she and her fiancé will be forced "to walk away from the expense and effort put into the [Cambridge Springs] home over the past two years, including modifications made and planned for the future in anticipation of the child's progressive disability." Mother's brief at 22. On three bases, we reject Mother' assertion.

First, Mother's protestations discount the facts that Fiancé both purchased and improved the home **during** his relationship with Mother and while she was exercising shared physical custody of L.C.P. pursuant to the **current** custody order that she is now attempting to modify. N.T., 6/7/21, at 61. Second, Fiancé testified unequivocally that it would not be a financial

- 24 -

hardship to sell his home and purchase another one. *Id*. at 95. Third, the improvements that Fiancé made to the current residence did not actually include making the house handicap accessible. *Id*. at 84. Indeed, no enhancements were completed to the first-floor bathroom in anticipation of L.C.P.'s use, and Mother and Fiancé still utilize the only bedroom on the main floor. As to the precise nature of the improvements, Fiancé testified, "we just basically remodeled everything, got everything looking nice; new electrical." *Id*. at 26, 83-84. He added, "Once [L.C.P.] gets to that point, there is going to be some [adaptions to the home]." *Id*. Based on the foregoing, we reject Mother's assertion that the trial court should have disregarded Fiancé's willingness to move to a more feasible location as overly burdensome.[10] As

_____

[10] Notwithstanding the perspective of the dissent, who argues that the trial court should have ignored both Fiancé's willingness to move closer to Father and his ability to do so without financial burden, it was not only valid, but necessary, for the court to consider Fiancé's willingness to move because that fact impacted the child's best interests, which, again, is the paramount consideration in this case. *Graves*, *supra* at *8. The dissent proffers two reasons for upending the custody order based upon the court's consideration of Fiancé's testimony: 1) "Fiancé's purported 'willingness to move' is irrelevant to whether Mother's circumstance would improve through the relocation[;]" and 2) moving would impose "an extreme hardship for Mother and Fiancé," particularly because it is not what they desire. Dissenting Memorandum at 11-12. Neither concern is warranted.

First, to the extent that the dissent protests the court's decision to account for Fiancé's testimony concerning alternative housing locations in the best-interest analysis, there is no error. Critically, L.C.P. indicated that she would suffer if her weekly contact with Father was less frequent. As Mother's proposed relocation would decrease L.C.P.'s contact with Father to three weekends per month for seventy-five percent of the year, the trial court

- 25 -

such, we discern no abuse of discretion in the court concluding, "Although fiancé indicated it would not be 'optimal' to sell his current residence and move, the main basis for this statement was the amount of work that has been placed into refurbishing the home. However, such work must give way to the relationship between [L.C.P.] and her father." Findings and Order, 7/12/21, at 14 (discussing § 5337(h)(6), whether the relocation would enhance the general quality of life for the party seeking the relocation including financial or emotional benefit or educational opportunity).

In sum, Mother's appeal fails because it challenges the weight that the trial court placed on the evidence. With respect to child custody cases, it is

_____

properly considered the existence of less imposing alternatives in determining whether the proffered proposal would serve the child's best interests. Clearly, this consideration is valid. *See* 23 Pa.C.S. § 5337(h)(10) ("Any other factor affecting the best interest of the child."). While the dissent denounces the trial court for what the dissent characterizes as taking advantage of Fiancé's planning, this criticism is unwarranted. Dissenting Memorandum at 12 n.10. The fact that Fiancé's foresight was commendable does not mean that the trial court was required to ignore competent evidence concerning Fiancé's willingness and ability to move.

Furthermore, regardless of the dissent's conjecture that relocating to an alternative site might potentially affect Mother and Fiancé adversely, the certified record confirms that Fiancé explored moving to an area that both is convenient to his work and enables L.C.P. to maintain "the same type of custody schedule." N.T., 6/7/21, at 91-92. He also noted that such a move was feasible. *Id*. at 92. In this vein, he indicated that although he would prefer not to move, it would not be a financial hardship to sell his home and buy a different home in another location. *Id*. at 95. Thus, unlike the dissent's foray into the theoretical hardships that Mother and Fiancé might face if they moved to a mutually convenient location, the trial court crafted a decision that serves L.C.P.'s best interests based upon the evidence that was actually presented during the hearing.

well-established that it is "within the trial court's purview as the finder of fact to determine which factors are most salient and critical in each particular case." *M.J.M. v. M.L.G.*, 63 A.3d 331, 339 (Pa.Super. 2013). The trial court carefully and thoroughly considered L.C.P.'s best interests, including, but not limited to, her physical disability, and the certified record supports the trial court's findings. Accordingly, we discern no abuse of discretion.

Order affirmed.

P.J.E. Bender joins this Memorandum.

Judge Pellegrini files a Dissenting Memorandum.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 3/15/2022